Altman, Appellant, *v.* Standard
Refrigerator Company, Inc.

Argued January 17, 1934; reargued May 23, 1934.
Before FRAZER, C. J., SIMPSON, KEPHART, SCHAFFER,
MAXEY, DREW and LINN, JJ.

*William A. Gray,* for appellant.

*L. Stauffer Oliver,* for appellee.

OPINION BY MR. JUSTICE MAXEY, June 30, 1934:

The appellant, Norman Altman, obtained a verdict against the Standard Refrigerator Company for $5,500 in an action of trespass for malicious prosecution. The court below granted defendant's motion for judgment n. o. v. on the ground that plaintiff "presented against the defendant no case of malice or want of probable cause." "The uncontradicted evidence," the court held, "must convince any candid mind that the prosecutor acted upon probable cause and without malice." The court said further: "[If] the capricious verdict [of the jury] must be sustained, the conclusion is a sorry reflection upon the ability of our legal procedure to attain the ends of justice."

Altman was employed as a salesman on a 10% commission basis by the Standard Refrigerator Company, Inc. (hereinafter referred to as the "company"), from August, 1925, to July, 1928. The action was founded upon Altman's arrest by or at the instance of the defendant on charges (1) of obtaining money on false pretenses from Alex. Shusko, one of the customers of the company, and (2) of the unlawful conversion of the company's money in a transaction with Max Jonas, another customer of the company. In the Shusko Case Altman was acquitted by a judge without a jury in Camden County, N. J. The state's case was that Shusko, who, it was testified to, could neither read nor write, had been imposed on by Altman, but when it was brought out at the trial that Shusko's wife, who could read and write, was in a back room at the time the contract was signed, and had signed the contract as a witness, the trial judge said that Shusko should have availed himself

of his wife's assistance in reading the contract before he signed it, and because he had failed to do this, he was "going to give Altman the benefit of the doubt and let him go."

In the Jonas Case Altman was acquitted by judicial direction in the Court of Quarter Sessions of Atlantic County, N. J. This direction was given because only stubs of the checks and photostatic copies of the checks Jonas had given Altman and not the checks themselves had been produced. The court held that this was not competent evidence.

On May 22, 1928, Altman, as agent for the company, obtained a written order from Alex. Shusko, of Camden, for certain merchandise to be delivered by the company for $1,100, payable $412 down, and the balance on delivery. This was signed by "A. Shusko, customer," and "N. Altman, representative."

On June 15, 1928, Altman had Shusko execute a "conditional bill of sale" for the same merchandise but Altman executed it as "Dealer-Jobber." The sales agreement was on the regular printed form of the company but the name of Norman Altman had been substituted for that of the company. The terms of this agreement were $412 cash upon execution, and $954 in eighteen equal monthly installments.

In June, 1928, when Altman had custody of the balance of $688 due by Shusko on the original order calling for a payment of $1,100, Altman before paying this to the company deducted $110 as his commission, and a "customer's discount" of $22. It was testified that the company's salesmen were not authorized to retain commissions when delivering collection proceeds to the company, but were paid their commissions by the company at the end of each month. When Altman made this deduction, the company's books showed that he had overdrawn his commission account by $715.45. The company's president, R. E. Frederick, and the bookkeeper also testified to this overdraft. When Altman's atten-

tion was called to this deduction, he said to the book-keeper: "Try and get the commission." This was reported to the president, and the latter sent the book-keeper to Camden to see Shusko. He learned from Shusko that the latter had not paid anything on his contract, except the $412 down payment. The fact that Altman had made to the company the final payment on the $1,100 due on the original order (except the $110 commission and the $22 "discount") though he received only $412 from the customer excited the suspicions of the president, and he also conferred with Shusko. He learned from him that when the merchandise had been delivered on or about June 15th, Altman had presented "some papers" and told him that it was necessary for him to sign them, that these papers were merely a contract between Shusko and the company for the sale of the merchandise, and that the amount stated in the contract was the same as in the order. Shusko further told Frederick that he was a foreigner and had difficulty in reading English; that Altman had been to see him many times, and that he believed in Altman, and therefore had signed the papers, i. e., the contract. Shusko then showed Frederick the copy which had been left with him by Altman. It was "the conditional bill of sale" of June 15th. Frederick noticed that Altman had filled in his own name and that the contract called for a purchase price of $1,366, instead of the $1,100 named in the order of May 22d. It also recited that a promissory note had been given by Shusko for the balance of $954, over and above the $412 down payment. This note Altman had discounted. While the contract covered the company's merchandise, the company's name nowhere appeared therein. In the first paragraph the name "Norman Altman" appears as being the person to whom the purchase price was to be paid. In the very next paragraph it is set forth that Shusko agrees "that the title and ownership of said property and equipment shall remain in you, your successors, and assigns, until the purchase

price has been fully paid in cash and all of the conditions hereof have been performed." "You" in that agreement can mean nobody but Norman Altman. The entire contract which Altman had by deception foisted upon Shusko represents Altman as the owner of the goods. Without the knowledge or consent of the owner, Altman in the contract *assumed* ownership of them and sold them for $1,366 as though they in fact belonged to him.

Frederick next employed a detective and together on July 9, 1928, they went to Shusko's store and arranged to have the latter telephone them when Altman would be there so that they could secrete themselves and overhear the conversation. This plan was carried out. When Altman arrived he declared to Shusko that the latter owed him $1,391, and then refigured the amount to $1,366. Altman asked for $500 on account, and when Shusko said that he could not pay it, Altman kept on reducing the figure until the sum he finally asked for was $50 on account. It was learned at this time that Altman had recorded a copy of the contract at the office of the register of deeds and mortgages, in Camden, and another copy at the North Camden Trust Company, where the Shusko note for $954 had been discounted.

Frederick and the detective next went to Philadelphia and acquainted Attorney Shallow of the Philadelphia bar with the facts of the Shusko transaction. They showed him the original order of May 22d, and told him about the contract of June 15th. Attorney Shallow said it seemed to him that there had been criminal imposition on Shusko but that since it had taken place in New Jersey, someone in that state should handle the case, and he recommended Attorney Varbalow of Camden. Frederick and the detective consulted this attorney and disclosed the facts to him. He advised them that a criminal action against Altman on the ground of obtaining money under false pretenses appeared to be justified but he said that he would like to talk to Shusko. This he did.

Attorney Varbalow testified that he went to the North Camden Trust Company, where he "got a glimpse of the discounted note, and that was assigned as collateral security, and the original signed by Shusko was identical with the copy at the county clerk's office." Shusko informed the attorney that he, Shusko, did not understand he was dealing with Altman, nor did he understand the price was to be $1,366. The attorney asked Shusko "how he came to sign the contract, and he said he could not read or write, except sign his name, and had he known about it he would not have signed the contract." The attorney told Shusko that in his opinion "he [Shusko] had been imposed on, because under our statute obtaining anything of value under false pretenses is a criminal offense" and he advised Shusko "to swear out a warrant" for the arrest of Altman. Frederick and the detective and Shusko went to the city hall at the direction of Attorney Varbalow, and Shusko swore out a warrant for Altman's arrest.

Altman under cross-examination admitted, as the documents themselves proved, that he had Shusko sign the contract in triplicate after the merchandise was delivered to Shusko; that the price stated in the papers which he had Shusko sign was $1,366, instead of $1,100, as named in the order; and that while the order stated that Shusko purchased the merchandise from the Standard Refrigerator Company, Inc., yet in the contract Altman's name was substituted for that of the company. He admitted further that he took the note which Shusko made out to the North Camden Trust Company, to the trust company, and got the $954 proceeds of it, and also received $412 from Shusko, thereby receiving a total of $1,366 on this sale, and all the company received was $1,100 less $110 commission, and an alleged "customer's discount" of $22, or the net sum of $968.

In appellant's paper book appears this statement: "The defendant company would not ordinarily allow over 12 months' credit, so the plaintiff, in order to ac-

commodate Shusko and complete the transaction, undertook to finance it himself. He had done this before, with the knowledge of his employer (Record, page 39a). He thereupon had Shusko make a down payment of $412 and entered into a finance agreement with him for the payment of a balance of $954 in eighteen equal monthly installments of $53 each. On this basis the total cost to Shusko was $1,366." The record neither at page 39a nor elsewhere justifies the statement that Altman "had done this before, with the knowledge of his employer," whether the sentence "he had done this before" be interpreted as meaning that he had financed *Shusko* before or financed *other customers* before. The question put to Altman on redirect examination at page 39a of the record was: "Had it, or had it not, been your practice, with knowledge of the company, prior to the spring of 1928, to finance some of these propositions yourself whenever people wanted credit?" He answered: "Yes, it was my practice to finance some things myself." This answer does not indicate that he, as agent for the company, ever before financed "propositions" like Shusko's, or financed any transaction with Shusko, or financed any transaction of any kind, *with the knowledge of the company* and with any of its customers.

Frederick also testified that in a conversation between the detectives and Altman, when he, Frederick, was present, the detectives said to Altman, "Why did you do this and get yourself into this fix?" and that he answered, "I needed the money." This was when he was arrested on the Shusko matter.

The president was asked by his own counsel: "Did your company ever enter into any agreement of sale, or otherwise, relating to the merchandise purchased by Mr. Shusko and the merchandise purchased by Mr. Jonas, with Mr. Altman?" This being objected to, defendant's attorney said: "I am trying to show that they never made any contract with Mr. Altman." Plaintiff's counsel then said: "Oh; I will agree to that. There is no

question about that." Attorney for defendant followed this by saying: "The company never made any agreement of sale or contract for the sale of goods to these parties with Mr. Altman." To this statement there was no objection.

The important point for us to consider in respect to the Shusko Case is that there is no contradiction in the record of the statement of the president of the company that Shusko had told him that he, Shusko, was deceived by Altman into signing the contract for the purchase from Altman of goods which the latter did not own. The fact that Frederick heard these statements from Shusko and saw the contract referred to constituted adequate grounds for the belief on his part that Altman had been obtaining money from Shusko under false pretenses. That such a belief was engendered in his mind is evident from his testimony and from his subsequent actions. Further, in proof of his good faith in this matter he laid all the facts he had discovered before a member of the bar of the county in which the justly suspected act took place. This lawyer after verifying the facts by consulting Shusko recommended the criminal prosecution of Altman. Frederick's consultation with a lawyer, if a full and fair disclosure of the facts was made, is evidence of his good faith, rebuts any imputation of malice, and is persuasive proof of the existence of probable cause.

Though Altman does not deny that he charged Shusko $266 more than the original order of Shusko called for, he sought to defend this charge by stating that he carried the account for Shusko for eighteen months, by discounting Shusko's note for $954 at the North Camden Trust Company. This was no defense whatever to the charge that he obtained money from Shusko by falsely pretending that the merchandise sold Shusko belonged to Altman.

The fact that Altman testified here that at his trial in Camden for obtaining money under false pretenses

Shusko demonstrated that he could read, does not in the slightest degree affect the question now before us. If we were here trying Altman for obtaining money by false pretenses, we might have to consider whether the representations made by Altman in submitting the written contract to Shusko in which Altman was described as the owner, or at least as "Dealer-Jobber," were of such a character as to deceive a person of ordinary caution and prudence. The plausibility of the representations would have to be determined by the capacity of the person to whom they were made and the circumstances under which they were made. Even if Shusko could read, it is not improbable that having known Altman as the agent of the company he would have accepted his statement as to the contents of the contract of sale without reading it and would have assumed that the contract was consistent in all its terms with the order which he had given twenty-four days previously. Neither do we believe that the fact that Shusko's wife, who could read English, was present, and could have discovered (assuming that she was intelligent) the imposition on her husband, exculpates Altman to even the slightest extent. However, that question is not before us.

The account of another customer, Max Jonas of Atlantic City, was then investigated. On February 8, 1927, Altman, as the company's agent, obtained a written order from Jonas for the company's merchandise for $1,162, payable $450 on delivery and the balance in twelve equal monthly installments. On February 28, 1927, the terms of this order were incorporated in a written contract signed by Altman as the company's agent. Altman himself made a down payment of $450 for Jonas and was later reimbursed by the latter with interest. Altman took from Jonas eleven notes, dated March 1, 1927, and payable to Altman's order. He testified that he received a total "of notes and checks" from Jonas of $1,160, and "the amount" he turned over to the company was $869. When the detective investigated this case

Jonas gave him these eleven cancelled notes. Altman admitted having received them, as well as two more for $90 each, from Mr. and Mrs. Jonas. Jonas told Frederick that he did not keep his cancelled checks. The check stubs showed that the notes in Jonas's possession had all been paid. There were two notes missing: one payable seven months and one nine months after date. Jonas told Frederick that while he did not know where they were, he was sure they had also been paid by him to Altman. His check stubs verified this. He also said that he had paid to Altman the additional sums of $94 and $100. The cancelled notes made out to Altman's order, turned over by Jonas to the detective, together with the check for $94 and the note for $100, all of which Jonas stated he paid to Altman, came to a total of $1,-176. Jonas also declared that he paid the amounts of the two missing notes, $90 each, making a total of $1,356. This information indicated to Frederick that Jonas had paid Altman on this account $487 in excess of the sum of $869 which Altman had accounted for to the company. If the two missing notes for $90 each are deducted from this sum, Jonas's statement to Frederick and the corroborative papers produced would logically induce a belief that Altman had received from Jonas $307 more than he had accounted for. Frederick would naturally be the more inclined to credit customer Jonas's statements indicative of wrongdoing by Altman after learning (as he had learned) of Altman's wrongful conduct with customer Shusko.

Altman in rebuttal declared that he had turned over to the company "everything that was due them for the notes [of Jonas] that were paid." He said that when he left the company, he went to Jonas and showed him the five notes, he, Altman, still had, three for $90 each, one for $72, and one for $100, totaling $442, with interest. He added: "Of this amount, $477 [apparently inclusive of interest], there was still due to the Standard Company $293, and to me $184. He [Jonas] gave me a $94

check and a 90-day note for $100, and I told him he had better start to pay the Standard Company because I no longer had authority, that I was not with them any more." It is important to note that the above *does not purport to contradict what Frederick testified Jonas told him, Frederick, that he, Jonas, had paid Altman* $487 (or $477, as Altman figured it) in excess of the $869, which Altman had accounted for. The $869 actually received by the company was $293 less than the sale price named in the Jonas order of February 8th.

Frederick and the detective then laid the Jonas matter before Attorney Varbalow. The latter testified: "They showed me some notes that had been paid by Jonas, and the signatures were torn off of them, and these notes were at variance with the amounts indicated as the installments paid on the Jonas contract." They showed him a check dated July 1, 1928, for $94 and told him that Jonas said "he paid all these notes and that he had the notes with the signatures torn off as representative of his having paid them. They had indicated to me that Jonas had overpaid some $200 in excess of what they had received and had proofs in the way of cancelled checks and notes to indicate that. I then concluded that this was an embezzlement, but inasmuch as it was in Atlantic City, I suggested that they see the prosecutor of the pleas of Atlantic County, and I then called up Mr. Hinkel, the assistant prosecutor,......and told him the facts as they were told to me." Hinkle told him "to send those people down and I will take them before the grand jury." The grand jury returned a true bill alleging embezzlement.

In appellant's paper book it is stated that "Altman testified that he advised his employer of the [Jonas] transaction," and reference is made to a certain page of the record. The only evidence there (or elsewhere in the record) as to this is the following: Q. "Did you [Altman] ever tell the Standard Company that you had the [Jonas] notes?" He answered: "Yes, I told Mr.

Shuslinger, the man who was the bookkeeper at that time, I told him that I had made the down payment on the fixtures, and that I was getting the rest from Jonas." Altman's statement (already noted) that "it was my practice to finance some things myself" and the statement that he "told the bookkeeper," etc., about the Jonas notes wholly fail as proof that the company had authorized any such course of dealing as he personally had with Jonas, or had ever expressly or tacitly ratified it. This failure of proof made rebuttal unnecessary and immaterial, yet Frederick did offer rebuttal on this point as follows: "We absolutely did not know about any such 'financing of customers.' We wouldn't stand for anything of that type." He was asked: "Did you or your company have any knowledge at all that he [Altman] was making these special arrangements with either Jonas or Shusko?" He answered: "Not until the time of the investigation."

There is no contradiction anywhere in the record of the statement of Frederick that Jonas *told him* that he had paid Altman on account of the merchandise bought from Frederick's company, more money than Altman had accounted for, and that Jonas exhibited to him corroborative proof of that fact. This constituted adequate ground for the belief on Frederick's part that Altman had unlawfully converted to his own use the company's money. Furthermore, Frederick made a full and fair disclosure of all the facts of this transaction within his knowledge to counsel presumably disinterested and competent and he obtained and acted upon that counsel's advice. This is evidence of his good faith, rebuts any imputation of malice, and is persuasive proof of the existence of probable cause.

The fact of the prosecutor's consulting counsel, and obtaining and acting upon his advice, should be considered rather as tending to rebut malice, than as bearing upon the issue of probable cause: Brewer v. Jacobs, 22 Fed. Rep. 217. "Strictly speaking, taking advice of

counsel and acting thereon rebuts the inference of malice arising from the want of probable cause": McClafferty v. Philp, 151 Pa. 86, 91, 24 A. 1042. See also Emerson v. Cochran, 111 Pa. 619, 622, 4 A. 498; Walter v. Sample, 25 Pa. 275, and Ravegna v. MacIntosh, 4 Dowl. & R. 107, 2 Barn & C. 693.

As the record stood at the close of the trial: (1) It had been proved that Altman had been arrested on criminal charges twice at the instance of the chief executive officer of the company and that he had been acquitted; (2) There was failure of proof that the arrests had been made maliciously and without probable cause, for proof of acquittal on a crime charged is not equivalent to proof of malice or want of probable cause. The termination in plaintiff's favor of the criminal proceedings on which the action of malicious prosecution is based is only *one of three* essential elements of proof required of a plaintiff in such an action as this. The other two elements are malice and want of probable cause. "Nothing will meet the exigencies of the case so far as respects the allegation that probable cause was wanting except proof of the fact. Though such allegation is a negative one in its form and character, it is nevertheless a material element of the action for malicious prosecution, and the burden is upon the plaintiff to prove affirmatively, by circumstances or otherwise, as he may be able, that the defendant had no reasonable or probable ground for instituting the original proceeding, unless the defendant dispenses with such proof by pleading singly the truth of the several facts involved in the charge": 18 R. C. L., section 32, page 51. "The great weight of authority and reason is that the mere fact of the acquittal of a defendant upon the trial of a criminal charge is not prima facie evidence of the want of probable cause for the prosecution": 18 R. C. L., section 23, page 40.

Wigmore in volume 2 of "Select Cases on the Law of Torts" (1912 edition), at page 897, section 309, says that a defendant is excused in an action for malicious

prosecution when any one of the following conditions is fulfilled: "either (a) the plaintiff was in fact guilty of the wrong as charged (just cause); or, (b) the defendant [in the civil case] believed and had probable ground to believe the defendant [in the criminal case] guilty (just cause); or (c) the defendant resorted to legal process for the purpose of securing justice upon the plaintiff, and not primarily to gratify personal malice or spite." In section 310, he says: "The defendant has not the burden of pleading and proving the existence of any one of the three facts which thus afford him excuses; the plaintiff has the burden of proving and pleading the nonexistence of all of the three; i. e., the circumstance that the defendant resorted to legal process is of itself an excuse which protects him, *unless the plaintiff proves that no one of the three additional facts existed.*" (Italics supplied.)

In the case of Roessing v. Pitts. Rys. Co., 226 Pa. 523, 75 A. 724, this court held that since the plaintiff met the burden cast upon him "only to the extent of proving his arrest, indictment, trial and acquittal," the court below erred in "shifting to the jury the responsibility for deciding whether" there was probable cause for the arrest. Judgment was by this court entered for defendant n. o. v.

In Stewart v. Sonneborn, 98 U. S. 187, the Supreme Court of the United States said: "In every case of an action for a malicious prosecution or suit, it must be averred and proved that the proceeding instituted against the plaintiff has failed, but its failure has never been held to be evidence of either malice or want of probable cause for its institution; much less that it is conclusive of those things."

In Boyd v. Kerr, 216 Pa. 259, 65 A. 674, this court said: "Where there has been a failure to show a want of probable cause, it is the duty of the court to enter a nonsuit or to direct a verdict for the defendant."

In McClafferty v. Philp, supra, STERRETT, J., said: "It was incumbent on the plaintiff to show not only that

there was want of probable cause for the prosecution, but also that there was malice on the part of the prosecutor."

In the case of Steimling v. Bower, 156 Pa. 408, 27 A. 299, the party sued "defendant on the ground that, even if mistaken as to the legal value of the facts, they afforded probable cause for instituting the prosecution" of the plaintiff on the charge of larceny. The court below instructed the jury "that as the facts charged did not amount to larceny they afforded no probable cause for the prosecution, and that this fact was evidence upon the question of the existence of malice in the mind of the prosecutor against the defendant." This court held "it was error to tell the jury that......the facts showed ......that no probable cause existed."

To entitle plaintiff to recover in an action for malicious prosecution, "it must clearly appear that the prosecution was groundless": Kirkpatrick v. Kirkpatrick, 3 Wr. 288.

Mitchell v. Logan, 172 Pa. 349, 33 A. 554: In that case, as in the case now before us, defendant had been acquitted of the criminal charge made but nevertheless the court below directed the jury to return a verdict for defendant because plaintiff had failed to show want of probable cause. The judgment was affirmed.

In Crescent City Live Stock Co. v. Butchers' Union Slaughter House Co., 120 U. S. 141, the Supreme Court of the United States quoted approvingly the ruling of the Supreme Court of Louisiana "that to sustain the charge of malicious prosecution it is necessary to show: '1st, that the suit had terminated unfavorably to the prosecutor; 2d, that in bringing it the prosecutor had acted without probable cause; 3d, that he was actuated by legal malice, i. e., by improper or sinister motives. The above three elements must concur.' "

On the state of the record at the close of plaintiff's case those three elements had not concurred. Plaintiff had proved *only one* of the three elements of his tripar-

480

tite charge, i. e., the unsuccessful termination of the criminal prosecution against him. He did not prove either the prosecutor's malice or want of probable cause. Therefore, defendant was entitled to binding instructions in its favor, but defendant did not rest on the record as it then was. It proceeded affirmatively to establish these facts which plaintiff did not even attempt to contradict, to wit: (1) Altman assumed the ownership of merchandise which belonged to the company and sold it as his own to Shusko and at a profit to himself (in addition to his commission), thereby obtaining money from Shusko under false pretenses; (2) Jonas told the company's president that he, Jonas, had paid Altman on account of merchandise purchased from the company a certain sum of money which Altman had not accounted for to the company.

With these undisputed or clearly established facts before the court below, we say in the language of Mr. Justice GREEN in Sutton v. Anderson, 103 Pa. 151, "It is not easy to conceive how a stronger case of probable cause than this could be made out." In that case this court held that in an action for malicious prosecution the defendant was entitled to a directed verdict because it had been shown that there had been a clear case of probable cause for the criminal prosecution.

The phrase "probable cause" is practically self-defining, but if a definition be required, one that has been frequently cited with approval by the appellate courts of this State is that found in McClafferty v. Philp, supra, "Probable cause is generally defined to be a reasonable ground of suspicion, supported by circumstances sufficient to warrant an ordinarily prudent man [in the same situation] in believing the party is guilty of the offense." In Delany v. Lindsay, 46 Pa. Superior Ct. 26, this is characterized as "a concise but comprehensive definition." See also Smith v. Ege, 52 Pa. 419.

When the facts are established or undisputed, who is to judge the existence of probable cause? This question

is settled. In Robitzek v. Daum, 220 Pa. 61, 69 A. 96, this court said in an opinion by Mr. Justice ELKIN, "What is probable cause and whether it exists under an admitted or clearly established state of facts is a question of law for the court: Walbridge v. Pruden, 102 Pa. 1." "Where there is probable cause for a prosecution the court errs in not so pronouncing": Dietz v. Langfitt, 63 Pa. 234. In Taylor v. American International Shipbuilding Corporation, 275 Pa. 229, 231, 119 A. 130, this court held: "If all the admitted facts, and the reasonable inferences therefrom, amount to probable cause, the court must so declare and direct a verdict for defendant." At 38 C. J., page 504, section 194, is laid down this principle: "Where the facts relied on as constituting probable cause are admitted or undisputed and only one inference can be drawn therefrom, the question of probable cause is solely for the determination of the court." In the case of McCoy v. Kalbach, 242 Pa. 123, 88 A. 879, this court held that probable cause "was so clearly shown as to require the court below to declare it existed." In Gow v. Adams Express Co., 61 Pa. Superior Ct. 115, which was an action for malicious prosecution, the facts showed that the plaintiff was discharged on a nolle prosequi after he had been confined in jail for seventy-six days. The court below held that "the facts that were either admitted or established by uncontradicted evidence constituted reasonable and probable cause," justifying defendant's arrest, and, as here, entered judgment for the defendant n. o. v. The judgment was affirmed.

Greenleaf on Evidence, 10th edition, volume II, page 410: "If the judge, upon the plaintiff's evidence, is of opinion that there was not probable cause for the prosecution, but upon proof of an additional fact by the defendant, by a witness who is not impeached or contradicted, he is of opinion that there was probable cause, he is not bound to submit the evidence to the jury, but may well nonsuit the plaintiff."

Appellant calls to our attention the case of Nanty-Glo Boro. v. American Surety Co., 309 Pa. 236, 163 A. 523, and argues that the decision in that case supports appellant's contention that the entering of judgment n. o. v. for the defendant in the instant case was an unwarranted interference with the finding of the jury and is decisive of the question now before us. The question decided in the Nanty-Glo Boro. Case is only a "distant relative" of the question now before us. We there decided that in a suit on a surety bond, plaintiff makes out a prima facie case only when its proof is sufficient not only in its quantity but also in its quality, i. e., in its credibility. The latter is for the jury; it is not a court's function to pronounce any oral testimony "credible." In the instant case we hold that accepting at its face value all of plaintiff's testimony as credible, it fails to support plaintiff's allegation of an arrest made maliciously and without probable cause.

Professor Thayer in his "Preliminary Treatise on Evidence at the Common Law," page 225, in discussing actions for malicious prosecution, aptly says: "Baptizing the question of reasonable and probable cause......as a 'mixed question of law and fact'......has only added to the confusion." At page 222, he says what the court really decides is "whether a certain conclusion is permissible, whether it *can be* reached by a jury." The jury's conclusion that plaintiff proved the existence of malice and want of probable cause is in this case not permissible. The maximum of plaintiff's proof was that he had been acquitted of the criminal charge preferred against him by the defendant. This was not sufficient.

If the plaintiff offers evidence which if credited sustains his burden of proof, and if this evidence is challenged, an issue of fact arises which must be submitted to the jury with proper instructions. A trial method which may be used at the discretion of the court and often is used in cases of malicious prosecution is for the court to request the jury to find a special verdict, placing on record all of the essential facts of the case, including

the disputed as well as the undisputed facts, and for the court to declare the law on the facts so found. See Panek v. Scranton Ry. Co., 258 Pa. 589, 102 A. 274. Whether or not there is probable cause for a prosecution for a violation of the criminal law is, under the facts found, admitted, or conclusively established, purely a question of law for the court.

A rule that an acquittal on a criminal charge is prima facie evidence that its prosecution was initiated maliciously and without probable cause, and therefore warrants an award of damages against the prosecutor is rejected by the overwhelming weight of authority and is condemned by every sound consideration of public policy. Such a rule would discourage bona fide efforts to enforce the criminal laws. Blackstone says in volume 3, section 127, page 1124: "...... It would be a very great discouragement to the public justice of the kingdom, if prosecutors, who had a tolerable ground of suspicion, were liable to be sued at law whenever their indictments miscarried."

A probable cause for one's prosecution may be even less than a strong probability of guilt, and yet even a strong probability of guilt does not measure up to the criminal law's requirement of proof beyond a reasonable doubt. Not proofs of guilt but substantial indications of guilt are legally justifiable motives for bringing a criminal prosecution. Anyone who has reason to believe that there is probable cause for prosecuting another has a legal right to undertake it. If those who do so are to be penalized by having damages awarded against them because the prosecution fails, few will be rash enough to approach the courts for the vindication of criminal laws which they with good reason honestly believe have been violated to their personal injury and to the public prejudice. The jury penalized this defendant for acting properly on a well-founded belief. This penalty the court below promptly annulled. Its action was right.

The judgment is affirmed.