## Stritmatter *v.* Nese et al., Appellants.

Argued March 23, 1943. Before MAXEY, C. J.; DREW, LINN, STERN, PATTERSON, PARKER and STEARNE, JJ.

10

*A. M. Oliver,* with him *Frederic G. Weir, Leo Daniels* and *John F. McDonough,* for appellants.

*Gilbert E. Morcroft,* with him *James H. Brennan,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, April 20, 1943:

This is an appeal from a judgment entered on a verdict of $3554 rendered against the two appellants, Ross Nese and Gust A. Katsilas, in an action for malicious prosecution.

The action was brought by Emil A. Strittmatter, Burgess of the Borough of East Pittsburgh, Pa., against the appellants and James Kelley,* who with four other councilmen constituted a majority of the Borough Council. The Burgess was indicted for embezzlement and fraudulent conversion of public funds, and for misfeasance in office. The information was signed by Ross Nese, the President of Council, pursuant to a Resolution of Council authorizing such action by him.

The criminal offense alleged was that the Burgess fraudulently withheld and converted to his own use moneys deposited by prisoners for their several appearances for hearings on charges of operating motor vehicles while under the influence of liquor, and fines paid by law violators. The alleged misfeasance in office was failure to keep correct accounts of all fees, fines and costs received by him, and failure to render to the Borough Council at its regular monthly meetings itemized state-

---

* Kelley was exculpated by a directed verdict.

ments of all such moneys so received, and failure to pay all such moneys into the Borough treasury prior to such regular meeting of the Borough Council, in violation of the provision of the Act of May 4, 1927, P. L. 519, art. X, sec. 1028; May 8, 1929, P. L. 1636, Sec. 3 (53 PS 131, sec. 12939). It was also charged in the indictment that the Burgess exercising the powers and jurisdiction of the Justice of the Peace in the enforcement of all ordinances of the borough, unlawfully assumed jurisdiction of crimes triable solely in the Court of Quarter Sessions, in that on six separate occasions in 1938 and 1939, he caused complaints against six defendants who were charged with operating a motor vehicle while under the influence of intoxicating liquor to be changed to the offense of disorderly conduct and disposed of the cases in summary proceedings. On all these charges the Burgess on February 9, 1940 was found "not guilty" by a jury. Eight months later this action was instituted by him.

The questions before us are whether there was affirmative proof that (1) the defendants had no reasonable or probable cause for instituting the prosecution, and (2) that the prosecutors were actuated by malice. In *Altman v. Standard Refrigerator Co., Inc.*, 315 Pa. 465, 477, 173 A. 411, we declared that in actions for malicious prosecution "the burden is upon the plaintiff to prove affirmatively, by circumstances or otherwise, as he may be able, that the defendant had no reasonable or probable ground for instituting the original proceedings". See also *Groda v. American Co.*, 315 Pa. 484, 173 A. 419; *Werner v. Bowers*, 318 Pa. 518, 521, 178 A. 831.

The evidence as to the alleged embezzlement and fraudulent conversion was that the Burgess was appointed to the office of Burgess of East Pittsburgh in 1934, and elected and reelected to that office in 1938, and 1942. One of his duties was to furnish a docket, wherein he was to enter all cases and charges, which docket was to be open to public inspection at reasonable times. During the year 1937 it was discovered that the Burgess' docket

from 1935 to 1937 showed erasures of the fines and costs paid by defendants following hearings held on April 4, 1936, and August 31, 1936, January 9, 1937, and January 11, 1937, February 20, 1937, two erasures of the fines and costs paid following hearings held on March 29, 1937. Further erasures of the fines and costs paid appear on the Docket after the hearings held on April 14, 1937, and April 26, 1937, May 3, 1937, and May 14, 1937, June 7, 1937, and June 8, 1937, August 10, 1937, and August 12, 1937.

The matter of the fines and costs for 1936 and 1937 was adjusted at a regular meeting of the Council in December 1938, when the Burgess paid into the Borough treasury over $510.55 which was found to be due. At this same meeting an "arrest sheet" was brought into the council chambers by Councilman James Kelley, showing a forfeiture of $75.00, which did not appear in the audit, but the Burgess denied he ever collected this money. A further investigation showed the payment of fines and costs that did not appear on the docket and were not included in the audit. The Burgess' Docket showed the delivery of prisoners to the County Jail in summary conviction cases and their release, but failed to show the payments of any fines and costs in these cases. There were produced photostatic copies of jail releases, bearing the Burgess' admitted signature and directed to the Warden of the Allegheny County Jail, calling for the discharge from custody of the prisoners, and setting forth the charge for which they were committed by the Burgess in default of the payment of fine and costs, the amount of which was set forth in the release, and stating *"the said fine and costs have been paid"*. The Burgess, despite this written evidence, denied that the fine and costs were paid. In one case he testified that the sister of one of the prisoners and her husband came to him and said " 'My sister got a card to go on a sewing project and if she isn't here she'll lose her job', and she said 'When I get my welfare check I'll pay you in piecemeal

what she owes you,' so I says 'Don't do that, you have suffered enough. If she comes to work let her pay that, I'll see that she does,' and that is the reason it isn't marked on the docket; there is nothing after the fine. And later I released her . . ." He also testified that she paid the $10.00 fine to the Chief after the Burgess called him up and said he was sending her up with $10.00 and "He was to get a release paper." He also denied he received any fine or costs in any of the other cases for which he was prosecuted, or that he received any of the bail which were deposited in drunken driving cases where the charge was changed to "drunk and disorderly." As to one of these cases the prisoner in that case admitted that he was arrested for drunken driving and testified that a deposit of $50.00 was made for his release, and the police officer testified he turned the money over to the Burgess with the arrest sheet. The Burgess admitted he ordered his release at the request of a friend but denied receipt of the money.

The evidence as to the charge of misfeasance in office, showed that from January through August 1937, the Burgess failed to submit monthly itemized statements of all fines and costs received by him to the Council. His explanation was that he "didn't through the advice of the Borough Solicitor at that time", although he was then in office three years, and on October 26, 1936, he was notified in writing by the Council that it was their desire that he set forth in his reports, the details relating to all arrests. This was what the Borough Law required him to do. He also testified that the Borough Solicitor said " 'You go through the same proceedings as the former Burgess', which he said he did, that is he "turned in reports maybe every two or three months." The Borough Solicitor did not testify in corroboration of the advice he is alleged to have given the Burgess.

The trial judge charged the jury, as the evidence warranted, that in the cases where defendants were charged with driving while intoxicated, "that somewhere accord-

ing to the evidence here, between the time the arrest was made and the time the case came on to be disposed of, the charge was changed from driving while under the influence of liquor to drunk and disorderly." The Burgess' explanation of this serious and well supported charge was that he acted on the legal advice of the then Borough Attorney, allegedly as follows: "The only thing you can hold them for is drunk and disorderly." The Burgess testified that "none of these men ever appeared before me. They had to put up a $25.00 forfeit for drunk and disorderly. It was a set-up in the office. If there is any changes made on the arrest sheets, there is never one of them appeared before me, no policeman swore before me that they were arrested for drunken driving at any time." However, the docket showed that some of these cases "paid fine and costs." The Burgess testified that "I never fined anybody without having a hearing but that is the way I'm supposed to enter it in the docket where the money goes and I didn't make that docket up." One of the police officers of the Borough testified that he made three different arrests in December of 1938 and January and April of 1939, and in each case charged the prisoner with driving while under the influence of intoxicating liquor and locked him up and had a physician examine him. He made a report on an arrest sheet charging driving a motor vehicle while under the influence of intoxicating liquor and attached the doctor's certificate certifying that the prisoner was under the influence of liquor. In none of these cases was there a hearing held by the Burgess. The police officer further testified "There is plenty more but that happened before 1938." He further testified that the Burgess ordered him "not to take any of these men before a squire." His order was given around 1937 or 1936. In spite of these orders he testified that he attempted to bring drunken driving cases before a Justice of the Peace but was suspended from the police force "a couple of times" by the Burgess for doing it. He also testified that the Burgess "called the whole police

force to a meeting in the police station and told us all not to take any more cases to a squire or he would suspend us," and that when he took a couple of cases to a squire he was suspended. The entries in the Burgess' docket in these drunken driving cases usually showed "Nature of charge, Disorderly conduct, violating Borough Ordinance No. 306 . . . Date of hearing, January 14, 1939. Fine $17.40."

The record further discloses that after complaints were also received by several of the councilmen from police officers and others concerning the handling of criminal cases by the Burgess, Mr. Nese, the President of the Council, took the matter up with the Borough Solicitor. The Solicitor advised him to obtain private counsel since he represented the Burgess as well as Council. As a result of this advice six members of the Council, including the appellants and Mr. Kelley and the Borough Solicitor, went to the office of John Duggan, Jr., an attorney-at-law in Pittsburgh, and obtained his advice. The evidence shows that Attorney Duggan did not rely upon the statements of the councilmen concerning the receipt of the fines and costs and the accounting for them, but he "requested that they bring in the records so that he could examine them personally. These records, . . . records of the police station and records of the council meeting and records of reports of Burgess Stritmatter to Council, were all produced, and the records showed the payment of moneys on certain dates by certain individuals, and there was nothing in the reports of the Burgess to show that he made any itemized account to Council of these fines and forfeits as he was required to do under the provisions of the Borough Code." Mr. Duggan then testified that he "asked them for permission to engage an investigator", and he "got Mr. McGuire, who had had considerable experience," and he "had him go out and interview a number of these people, . . . to get affidavits from them to the effect that they had paid these various sums of money into the Burgess' office at

various times, and then when we had these affidavits and when we had before us the records showing there was no accounting ever made of the fines that had been received, I told them that in my professional judgment the case—the evidence was sufficient to warrant a prosecution . . . I didn't advise the actual prosecution. I left it up to them, but I said clearly that there was a violation of the law, that these funds unquestionably had been received, they belonged to the Borough and had not been accounted for as provided for under the Code, and I told them that the offense was complete if they wanted to prosecute further."

The resolution of council directing the prosecution of the Burgess and the information were drawn by this attorney. He testified that he "felt that since it was a public matter and involved public funds, that if one should sign the information it should be done by virtue of a resolution of Council." He was then asked the question "Those resolutions weren't passed with the idea of evading personal responsibility on the individuals to your knowledge?" and he answered "No, I don't think that was even thought of at the time, I know it wasn't discussed, . . . I felt the responsibility they all should share because they are all public officials."

That these councilmen made full disclosure of the facts to this attorney is uncontradicted. The attorney was asked on cross-examination "It is just possible, Mr. Duggan, that your clients didn't tell you the whole story behind these prosecutions?" His reply was, "No, I am satisfied they told me at least the meat of the story, because I sat in the trial of the criminal case; of course I didn't take any active part in it, but what was unfolded there was substantially what they had told me, and I didn't incorporate in the information anything that was not justified by the records and affidavits that Mr. Mc-Guire had obtained."

In cases of this kind ". . . the court must say, as a matter of law, whether the facts proven show probable

cause. . . . But, if all the admitted facts, and the reasonable inferences therefrom, amount to probable cause, the court must so declare, and direct a verdict for the defendant." *Taylor v. American International Shipbuilding Corp.*, 275 Pa. 229, 231, 119 A. 130; *Altman v. Standard Refrigerator Company, Inc.*, (supra) at page 480 et seq. This record discloses these facts: (1) Fines and costs were paid by defendants in summary prosecutions before the Burgess, which never reached the Borough Treasury, (2) Deposits were fortified in drunken driving cases, which never reached the Borough Treasury, (3) Official records of the Borough failed to disclose the receipt of these fines, costs and forfeitures, (4) the official report of Burgess Stritmatter to Council of the Borough did not contain a statement of the receipt of these fines, costs and forfeitures and the Burgess did not account for them, (5) charges of drunken driving were changed to charges of being drunk and disorderly, and (6) that the Burgess failed to render to the Borough Council at its regular meetings itemized statements of moneys received by him.

That there were public funds unaccounted for is plainly manifest. That these funds were turned over to the Burgess was testified to by police officers. It is true that the Burgess contradicted the officers, but with the Burgess' written releases stating that the fines and costs had been paid and with the law calling upon him to account for this money and with three credible police officers testifying that they turned this money over to him and with the Burgess neglecting to file any account with Council for almost seven months as he was required by law to do, we must adjudge that suspicion of his criminal wrongdoing was abundantly warranted and there was in law probable cause for the initiation of criminal proceedings against him. As to the cases where defendants were originally charged with driving while under the influence of intoxicating liquor and these charges were changed to charges of being drunk and

disorderly and the defendants were released upon a deposit, none of these deposits were ever accounted for. Here also the police officers testified that they turned this money over to the Burgess. The Borough law calls for the Burgess to make an itemized account of all these moneys and to report the same to Council. This he failed to do.

In those cases where defendants were charged with driving while under the influence of intoxicating liquor and such charges were changed to drunk and disorderly and the defendants released upon a deposit, the police officers testified that the Burgess warned them not to take such cases "before a squire court" and one police officer was suspended for violating this warning. The Burgess attempts to explain this by stating that it was upon the advice of the Borough Solicitor, but this unsupported explanation given by the Burgess is not a legal exculpation. Of this the trial judge said that "that explanation was not made before; whether it was because of stubbornness on the part of the Burgess that it was not made, or whether it was due to a disinclination or refusal on the part of Council to hear it. . . ."

Admittedly, a number of persons were arrested by the borough police officers in serious drunken driving cases. A physician certified that the persons so charged were under the influence of liquor. The Doctor's certificates were attached to the arrest sheets containing not only the drunken driving charges but the deposit money. These were turned over to the Burgess. So far as the records show, nothing further was done in these cases with the exception of forfeiting the deposit under a drunk and disorderly charge. The Chief of Detectives of the Union Railroad delivered these doctors' certificates to the Council. The police officers advised them of the conditions. With such testimony presented to the Council, it would have been derelict in its duty had it failed to take action upon it.

The plaintiff charged that the prosecution was due to a factional fight and to gratify the appellants' per-

sonal malice. To rebut the charge of malice the appellants showed (as above indicated) that seven of the nine members of the Council, together with the Borough Solicitor, engaged private counsel who had no interest whatsoever in the matter, and acted upon his advice. In *Altman v. Standard Refrig. Co.,* (supra) at page 476, we said: "The fact of the prosecutor's consulting counsel and obtaining and acting upon his advice, should be considered rather as tending to rebut malice, than as bearing upon the issue of probable cause: *Brewer v. Jacobs,* 22 Fed. Rep. 217. 'Strictly speaking, taking advice of counsel and acting thereon rebuts the inference of malice arising from the want of probable cause': *McClafferty v. Philip,* 151 Pa. 86, 91, 24 A. 1042. See also *Emerson v. Cochran,* 111 Pa. 619, 622, 4 A. 498; *Walter v. Sample,* 25 Pa. 275, and *Ravegna v. Macintosh,* 4 Dowl. & R. 107, 2 Barn & C. 693."

We have in this case not only a full disclosure to the attorney of the facts within the knowledge and information of the appellants, but a personal investigation by the attorney of these facts and a submission of his findings to the Council. There was no evidence tending to show that the attorney's advice was not sought and acted on by the defendants in good faith. See *McCafferty v. Philip,* supra. Under these circumstances not only is malice rebutted, but it had bearing upon the issue of probable cause, for the existence of probable cause depends upon the facts brought home to the defendant and within his knowledge at the time the prosecution was instituted, and not upon matters then unknown to him. In the Restatement of Torts it is stated: (1) "The advice of an attorney at law admitted to practice and practicing in the state in which the proceedings are brought whom the client has no reason to believe to be interested, is conclusive of the existence of probable cause for initiating criminal proceedings in reliance upon the advice if it is (a) sought in good faith, and (b) given after a full disclosure of the facts

within the accuser's knowledge and information." Vol. 3—Section 666, p. 416—Effect of Advice of Counsel.

The uncontradicted testimony in this case and the documentary evidence shows that there were grounds for an honest and reasonable belief on the part of the members of Council that this plaintiff was guilty of the crimes with which they charged him. This plaintiff made out no prima facie case in support of his charge of malicious prosecution.

In *Altman v. Standard Refrig. Co., Inc.,* (supra) at page 483, we said "Anyone who has reason to believe that there is probable cause for prosecuting another has a legal right to undertake it. If those who do so are to be penalized by having damages awarded against them because the prosecution fails, few will be rash enough to approach the courts for the vindication of criminal laws which they with good reason honestly believe have been violated to their personal injury and to the public prejudice." This is particularly true in this class of cases where embezzlement of public funds and misfeasance in office appear to have been committed. "The public interests demand that courts shall not frown upon honest efforts to bring the guilty to justice:" *Smith v. Ege,* 52 Pa. 419, 422. In *Curley v. Automobile Finance Company,* 343 Pa. 280, 286, 23 A. 2d 48, we said, quoting from Thayer in his "Preliminary Treatise on the Law of Evidence", p. 230: "The reasons which have availed to keep this particular question of fact, [the existence of probable cause], in actions for malicious prosecution and false imprisonment, in the hands of the court, are easily to be seen, and have already been suggested. It is the danger so often recognized by the courts, e. g., by Lord Colonsay [in *Panton v. Williams,* 2 Q. B. 169], lest those who would come forward in aid of public justice should be intimidated or discouraged."

The judgment is reversed and is here entered for the defendants.