**James PSINAKIS**

v.

**Alexandra PSINAKIS, Individually, and Alexandra Psinakis, Administratrix of the Estate of George Psinakis, Appellant.**

**Stella CAKOUROS**

v.

**Alexandra PSINAKIS, Individually, and Alexandra Psinakis, Administratrix of the Estate of George Psinakis, Appellant.**

**Nos. 11423, 11424.**

United States Court of Appeals, Third Circuit.

Argued Nov. 15, 1954.

Decided April 6, 1955.

**420**

Frank P. Barnhart, Johnstown, Pa. (John E. Evans, Pittsburgh, Pa., George M. Henry, Philadelphia, Pa., on the brief), for appellants.

Alexander Unkovic, Pittsburgh, Pa. (A. E. Kountz, Kountz, Fry & Meyer, Pittsburgh, Pa., Ray Patton Smith, Johnstown, Pa., on the brief), for appellees.

Before BIGGS, Chief Judge, and GOODRICH and HASTIE, Circuit Judges.

BIGGS, Chief Judge.

Many years ago George and James Psinakis came to this country from Greece. They settled in Johnstown, Pennsylvania, and engaged in the business of making and selling candy. George ordinarily handled the administrative end of the business and James usually supervised the candy making. James was married and members of his family also helped conduct the business. After years of work the brothers were successfully operating two confectionary shops, the "Oasis" and the "State Sweet Shop" in Johnstown.

In 1947, George went to Europe and there married Alexandra, a Greek national. George and his wife returned to this country. In February 1949 George and Alexandra's daughter, Calliope, was born. In September 1949 George became ill and entered a hospital. In December he died leaving no will. Alexandra and Calliope were the sole heirs of his estate.

In December 1949, Alexandra was appointed administratrix of the estate. Alexandra asserted that George had been the sole owner of the stores and called on James to surrender possession but James claimed that he and his brother had been partners and that therefore he was properly in possession as a liquidating partner. James continued to operate the "Sweet Shop." He ordered new supplies, carried merchandise from the "Oasis" to the "Sweet Shop" to replenish stocks, and retained the cash taken in daily.

Alexandra then consulted her attorney who advised her on January 6th, 1950 to "make an information" against James. The lawyer then took Alexandra to a city alderman where an information was sworn out by her under the Pennsylvania Surety of Peace Act of 1860, 19 Purdon's Pa.Stats.Anno. § 23. The Act provides:

"If any person shall threaten the person of another to wound, kill or destroy him, or do him any harm in person or estate, and the person threatened shall appear before a justice of the peace, and attest, on oath or affirmation, that he believes that by such threatening he is in danger of being hurt in body or estate, such person so threatening as aforesaid shall be bound over, with one sufficient surety, to appear at the next sessions, according to law, and in the meantime to be of his good behavior, and keep the peace towards all citizens of this commonwealth."

The information, sworn out by Alexandra against James under this Act, alleged that:

"[James] did * * * unlawfully threaten to destroy and damage the property and estate of your affiant and unlawfully did your affiant harm in property and estate; that from the manner and conduct of the defendant the affiant believes and fears that the defendant will carry his threats aforesaid into execution and do further harm to affiant's property and estate; that affiant is actually in danger of being hurt in property and estate; that the defendant's acts were done maliciously and with intent to do harm to the property and estate of the affiant; and affiant being then and there the administratrix of the said estate, to wit: estate of George Psinakis, deceased."

After obtaining this information, the lawyer and Alexandra went to the "Sweet Shop." When James refused to surrender possession on demand, the lawyer called in plainclothes police officers who arrested James and conducted him to the alderman's office. There, James was released pending hearing after posting $1,000 bail. James then returned to the store. Later that same day, he was again arrested under the Surety of Peace Act on the basis of another substantially similar information and again was released on $1,000 bail. On returning to the store after this second arrest, James ordered a locksmith, who had been hired by Alexandra's counsel, to stop changing the lock on the shop door and again entered the store. He was again arrested. After posting $1,000 bail for the third time, James returned to his home.

For many years prior to January 6, 1950, Stella Cakouros, a daughter of James, had worked in the stores, but on January 6 she was no longer working there. On that day, however, she had called at the "Sweet Shop" and was present when her father suffered his first arrest. Stella remained in the store in the absence of her father until she also was arrested under the Surety of Peace Act on an information sworn out by Alexandra on the advice of counsel, alleging the same facts which were contained in the information lodged against her father, James. After appearing before the alderman, Stella posted $1,000 bail and returned to the store. She then left the store and went to her home, where she was again arrested on the basis of another information sworn out by Alexandra on the advice of counsel alleging the same grounds as the original information. Stella again posted $1,000 bail pending a hearing on the informations.

On January 13, 1950, hearings were held before the city alderman on all of the informations filed against James and Stella. All the Psinakises and Mrs. Cakouras were represented by counsel and evidence was received. The alderman found as to the informations, with the exception of the last filed against Stella, that "the threats made [by James and Stella] were made maliciously and that the prosecutrix' danger of being hurt in estate is actual", and that "a prima facie case has been made out." As to the last information filed against Stella, decision was reserved by the alderman and later on the same day that information was withdrawn with costs paid by the prosecution. On the basis of his findings the alderman then bound James and Stella over to the next term of the Court of Quarter Sessions. On May 8, 1950 the case against Stella was dismissed and on May 29, 1950 the cases against James likewise were dismissed by the Court of Quarter Sessions with costs taxed against the prosecutrix.

On January 10, 1950, after the arrests had been made but before the hearing before the alderman, Alexandra petitioned the Orphans' Court for an injunction restraining James from interfering in the business. On that day, the Orphans' Court entered a temporary injunction granting such relief. On April 27, 1951, the temporary injunction was made final, the Orphans' Court determining that Alexandra and not James was the owner of the stores.

James, on May 29, 1951, and Stella, on June 1, 1951, instituted separate suits against Alexandra alleging that the arrests constituted malicious prosecutions. But on August 30, 1951, both complaints were amended so as to omit the paragraphs setting up the theory of malicious prosecution. In substitution it was alleged that:

"Plaintiff avers that the aforesaid acts of the Defendant and her agents amounted to an abuse of process, said three prosecutions for Surety of the Peace being used unlawfully to obtain by threat, force and intimidation the possession of said 'State Sweet Shop' and the contents thereof, also to obtain possession of 'The Oasis' and the contents thereof. * * * Said misuse of said criminal proceedings was for a purpose other than that which they were designed to accomplish, and Defendant thereby sought to obtain results not lawfully or properly attainable under a prosecution for Surety of the Peace. Moreover, Defendant did obtain such results by the use of said criminal proceedings.

"Defendant in the use of said * * * prosecutions of the Plaintiff for Surety of the Peace acted knowingly, wilfully, maliciously, and vindictively, and without probable cause."

The cases were then consolidated for trial to a jury at the same time. The court charged the jury as a matter of law that there was "no probable cause" for these prosecutions, and submitted to the jury the following written interrogatory: "Was Alexandra Psinakis motivated by malice in the commencement of the surety of peace prosecutions involved in this case?" The jury returned the interrogatory with an affirmative answer and rendered verdicts of $13,000 for James and $5,000 for Stella. Certain motions made by Alexandra and discussed hereinafter were denied and she appealed.

These cases were properly in a United States District Court on the basis of diversity jurisdiction, since James and Stella are citizens of Pennsylvania and Alexandra, although now a naturalized citizen residing in Pennsylvania, was at the time of the institution of the suit an alien. See Hart and Wechsler, The Federal Courts and the Federal System, pp. 898–900.

Although Alexandra moved for a new trial on the basis of certain specified errors said to have been made in the charge, she took only a general objection to the charge before the jury retired and therefore cannot now assail the charge as erroneous since she did not state "distinctly the matter to which [s]he objects and the grounds of [the] objection" as required by Rule 51, Fed. Rules Civ.Proc. 28 U.S.C. However, Alexandra did move for judgment n. o. v. on the basis of the trial court's refusal to grant her "motion for binding instructions" upon all the law and evidence. The trial court treated this "motion for binding instructions" as a motion for a directed verdict and refused to grant judgments in Alexandra's favor notwithstanding the verdicts. Cf. Rule 50, F.R. C.P. Despite this somewhat confused state of the proceedings we properly may consider these cases on the basis of the trial court's refusal to grant Alexandra's motion for judgment and will do so.

We must ascertain whether the verdicts can be sustained on the evidence considered in the light most favorable to James and Stella. At the outset, however, we must determine the theory of the plaintiffs' suits so that we can ascertain if the evidence is sufficient to establish James' and Stella's cases. The amended complaints clearly allege only an abuse of process by Alexandra. The court below in its opinion said: "It is my view that the plaintiffs' theory as to the causes of action in the two cases is the correct one. The facts show an abuse of process and in this case a malicious abuse of process."[1] James and

1. No opinion reported for publication.

Stella in their brief in this court state that the complaints "clearly set[s] forth a cause of action based upon abuse of process," and Alexandra in her brief says that "the effect of the amendments [to the complaints] is to charge abuse of process." Nevertheless, the conduct of counsel and the court at the trial and the charge indicate that the trial proceeded on a theory of malicious prosecution as well. James and Stella in their brief here state: "However, even * * * if the cases had otherwise been pleaded, the result would be the same. Under the present practice * * * pleadings can be freely amended to conform to the evidence. There is now the element of an 'automatic amendment of the pleadings' in most circumstances where the evidence has gone outside the pleadings." And in her brief, Alexandra says: "Obviously the purpose of the amendments was to change the cause of action from malicious prosecution to some [other] form * * *. It is seriously doubted whether they succeeded in doing so. * * *" Since Rule 15(b) provides that "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings" and that "failure sc to amend does not affect the result of the trial of these issues", we shall consider the evidence as though both abuse of process and malicious prosecution were charged.

■ Tortious abuse of process is defined by the Restatement of Torts, § 682, as follows: "One who uses a legal process, whether criminal or civil, against another to accomplish a purpose for which it is not designed is liable to the other for the pecuniary loss caused thereby." The law of Pennsylvania governs this diversity suit, and the fact that the elements of the cause of action for abuse of process are the same under that law is revealed by the following statement in Mayer v. Walter, 1870, 64 Pa. 283, 285–286: "An abuse is where the party employs it for some unlawful object, not the purpose which it is in-

tended by the law to effect; in other words, a perversion of it." And in a more recent case, Publix Drug Co. v. Breyer Ice Cream Co., 1943, 347 Pa. 346, 348, 32 A.2d 413, 415, the cause of action was similarly defined: "The gist of an action for abuse of process is the improper use of process after it has been issued, that is, a perversion of it". See, e. g., Foster v. Sweeny, 1826, 14 Sarg. & R., Pa., 386 and Morphy v. Shipley, 1945, 351 Pa. 425, 41 A.2d 671. The action for abuse of process therefore lies where there has been a use of process for some collateral purpose and it is clear that the process must have been intentionally used for that wrongful purpose, both under the general rule, see Prosser, Torts 894–895, and under Pennsylvania law, see Barnett v. Reed, 1865, 51 Pa. 190, 196.

■ The process utilized in this case, the Surety of Peace Act of 1860, by its very terms was designed to be used when "any person shall threaten the person of another to * * * do him any harm in person or estate, and the person threatened * * * believes that by such threatening he is in danger of being hurt in body or estate". Thus, the Surety of Peace Act is a process properly to be utilized as a means of protecting property. Surely the conduct of James, in running the store, transferring the stocks, and carrying out the cash receipts, injured Alexandra in estate and constituted a continuing threat to her property at the time of each arrest. It is not so clear, however, that the conduct of Stella constituted such a threat. At the time of her first arrest, she was merely remaining in the store after her father's arrest, apparently to keep an eye on it in her father's absence. At the time of her second arrest, Stella had left the store and gone home without having given any specific indication of an intent to interfere with the store property.

■ Nevertheless, for Alexandra to be civilly liable for an abuse of process, James and Stella must show that the arrests were made for some collateral object other than the protection of her

property from threatened injury, the object for which the Surety of Peace Act may be employed properly. The only evidence adduced by James and Stella that could in any way be taken to show a collateral objective on the part of Alexandra was the testimony of Stella that she heard Alexandra say in the store in the course of the arrests: "Boy, this has become a theater. I will break them yet." Alexandra denied having made this statement, and all the other evidence indicates that Alexandra's sole purpose was to protect her property. In fact, Alexandra instituted the arrests only after she consulted her attorney, presented him with the facts, and asked him what to do to regain her property. Alexandra's attorney advised her to make the arrests and she followed that advice in order to protect her property. Therefore, it is our opinion that what evidence there was that Alexandra used the process under the Surety of Peace Act for an improper, collateral purpose was insufficient to present a jury question.

 If the cases be deemed to have been tried on the theory that the cause of action was for malicious prosecution, there is insufficient evidence to support the verdicts. The elements of malicious prosecution are defined by the Restatement of Torts, § 653, as follows: "A private person who initiates criminal proceedings against another who is not guilty of the offense charged is liable to him for the harm done thereby if the proceedings * * * were initiated * * * without probable cause, and * * * primarily because of a purpose other than that of bringing an offender to justice, and * * * have terminated in favor of the accused." The elements of the cause of action are the same in Pennsylvania. In Publix Drug Co. v. Breyer Ice Cream Co., supra, 347 Pa. at page 349, 32 A.2d at page 415, the Supreme Court of Pennsylvania said: "In an action for malicious arrest of the person, the defendant is excused when any one of the following conditions is fulfilled: 'either (a) the plaintiff was in fact guilty of the wrong as charged (just cause); or, (b) the defendant (in the civil case) believed and had probable ground to believe the defendant (in the criminal case) guilty (just cause); or, (c) the defendant resorted to legal process for the purpose of securing justice upon the plaintiff, and not primarily to gratify personal malice or spite': Altman v. Standard Refrigerator Co., 315 Pa. 465, 478, 173 A. 411, 416. * * * The plaintiff has the burden of pleading and proving these conditions although they are negative in form."

 Specifically on the issues of the existence of malice and probable cause which are necessary ingredients of the cause of action, there was not sufficient evidence to show that Alexandra did not reasonably believe there was probable cause for her prosecutions. The existence of probable cause on facts clearly shown is ordinarily a question for the judge to decide. See Restatement, Torts, vol. III, p. 381, and Morphy v. Shipley, supra, 351 Pa. at page 431, 41 A. 2d at page 674. The trial judge here charged the jury as a matter of law that there was no probable cause. We must disagree for in our opinion there was as a matter of law clearly probable cause for the prosecutions.

 Under the general rule, the advice of a local attorney sought in good faith after a full disclosure of the facts is conclusive of the existence of probable cause. See Restatement Torts, § 666. And under the Pennsylvania rule the fact that the action was taken on the advice of counsel is at least strong evidence that there was probable cause and a lack of malice on the part of the defendant. See, e. g., Stritmatter v. Nese, 1943, 347 Pa. 9, 19–20, 31 A.2d 510, 515; Morphy v. Shipley, supra, 351 Pa. at page 432, 41 A.2d at page 675; and Aland v. Pyle, 1919, 263 Pa. 254, 257, 106 A. 349, 350. Alexandra relied on the advice of counsel in good standing at the Pennsylvania Bar in instituting each of the criminal actions. The evidence is almost overwhelming that Alexandra sought that advice in good faith and disclosed to her attorney all of the facts she knew. In addition,

the commitment of the person arrested by the responsible public official is evidence that there was probable cause for instituting the proceedings. See Prosser, Torts 878; cf. Graver v. Fehr, 1886, 3 Sadler 203, 210, 6 A. 80, 83. The city alderman committed James and Stella and found after hearing both sides to the dispute, that a prima facie case had been made out against them. Consequently, considering all the evidence in the light most favorable to James and Stella, it is our opinion that there was no sufficient showing that Alexandra did not reasonably believe there was probable cause for the prosecutions and accordingly an action for malicious prosecution against her cannot be sustained.

Because of the disposition thus made of the cases, there is no reason to discuss the other points raised by counsel.

The judgments for James and Stella will be reversed and the cases remanded with the direction that judgment in each case be entered for Alexandra Psinakis.