BRUNSWICK–BALKE–COLLENDER CO. v. FOSTER BOAT CO.

No. 9634.

Circuit Court of Appeals, Sixth Circuit.

April 12, 1944.

Morton Keeney, of Grand Rapids, Mich. (Butterfield, Keeney & Amberg, Morton Keeney, and Harry Shulsky, all of Grand Rapids, Mich., on the brief), for appellant.

Charles H. Menmuir, of Traverse City, Mich., and Howard L. Campbell, of Manistee, Mich. (Meggison & Menmuir, of Traverse City, Mich., and Campbell & Campbell, of Manistee, Mich., on the brief), for appellee.

Before HICKS, SIMONS, and HAMILTON, Circuit Judges.

SIMONS, Circuit Judge.

The appeal is from a judgment awarding damages to the appellee for the breach, by the appellant, of a contract entered into on October 25, 1940, for the manufacture and sale of rough bowling pin blocks which the appellee was to make and the appellant to buy. None were ever fabricated and each of the litigants charged the other with an anticipatory breach excusing performance. The cause was submitted to a jury and the appellant's grievance is failure of evidence to sustain the verdict and so error by the court in denying its motion for peremptory instructions, and likewise denial of its motion to set aside the verdict and to enter judgment in its favor, or, in the alternative, for new trial.

The appellant is the well-known manufacturer of bowling and billiard supplies, and contracted with the appellee, a small boat builder at Charlevoix, Michigan, for supplying it with the rough-turned blocks from which tenpins are made. By the terms of the agreement the appellant was to pay for the blocks at prices ranging from 7¢ to 36¢ per pin, according to grade. The quantity to be manufactured was to comprise 200,000 rough-turned tenpin blocks, 60,000 rough duck pin blocks, and 30,000 rough candle pin blocks, with delivery upon a schedule to be later agreed upon, at the appellant's factory in Muskegon. Payment was to be made, upon delivery, at the rate of 23¢ for each block in a full car shipped, provided the car contained at least 50% of the highest grade of blocks, with final settlement to await ultimate grading as disclosed by the buyer's finishing operations at its factory. The contract was to take effect immediately and to continue up to and including December 31, 1941.

The appellee, at its plant in Charlevoix, had only such general woodworking machinery as is required for its boat building enterprise, and so the appellant agreed to furnish special machinery consisting of a corner bolter, lathe, drying oven and coating machine with the necessary equipment therefor. Some of this machinery was shipped, but up to the middle of February, 1941, the appellee was still without knives for the lathe, without the drying oven, part of the bolter, and its motor and starter switch, although it had been assured by the plaintiff that it could be in production by December 1. Immediately after obtaining the contract, Foster, the president of the appellee, advertised for capital to enable him to perform. As a result, Stites, a man with some woodworking experience, entered the appellee's employ as production manager, and loaned it $4125. The appellee moved some of its own machinery to make room for the new equipment, obtained a $7000 line of credit on a secured basis from the local bank, made some tentative agreements and one or two firm contracts for pin logs, received delivery of a few logs at its plant, installed a new heating plant

and power line, which, though of general utility, were acquired with the pin contract primarily in mind.

There is no dispute that the appellant failed to furnish Foster with all of the equipment it had agreed to provide. There is also no dispute that Foster failed to set up such of the machinery as it had received, and failed to have ready at its plant a sufficient quantity of hard maple logs with which to begin operations. So the dispute bears two aspects—the appellee contending that its failure to perform was due to the breach of the appellant in not sending it the equipment agreed upon, with the time of the breach being identified as of February 13, 1941, when, upon its inquiry as to the date of shipment of the balance of equipment the appellant replied that its production men were busy with active tenpin producers and that it must use its equipment to best advantage. The appellant denies that it breached the contract, but contends that if so, performance was excused because the appellee was unwilling and unable to perform even if all of the agreed equipment had been supplied. Foster sued for damages because of expenditures, commitments, and lost profits, and Brunswick counterclaimed for loss of the gains it would have made in the sale of finished pins had the contract been completed.

■■■ Upon the question whether Brunswick first breached its contract being raised by a motion for directed verdict and a motion for judgment notwithstanding the verdict, the evidence must be considered in the light most favorable to the plaintiff, and all conflicts resolved in its favor. Michigan law is, in this respect, consonant with general law. Thurkow v. City of Detroit, Michigan, 292 Mich. 617, 291 N.W. 29, and cases there cited. So viewed, there was evidence to sustain the verdict. It was within the competence of the jury to find that though Brunswick had all the agreed equipment at its Muskegon plant and could have delivered it to the plaintiff at Charlevoix in 24 hours, it never sent the knives for the lathe, the drying oven, or the saw, motor and switch for the corner bolter. Although Foster had been told that his company could be in production by December 1, the last piece of equipment actually shipped did not arrive until early in February. The jury could also have found from the evidence that the defendant was negotiating with another potential pin supplier in the vicinity, and had advised him to keep in touch with it because it was trying to rid itself of the Foster contract. The defendant delayed in advising the plaintiff how to set up the machines, and there was evidence which, if credited by the jury, indicated that the delay of the plaintiff in installing it, was in response to the defendant's instructions. Likewise, there was evidence that the defendant did not complain of the plaintiff's lack of preparation, nor excuse its own procrastination by reason of the plaintiff's. There having been no prior repudiation of the contract by Foster, the defendant's letter of February 13 might well have been regarded by the jury as its repudiation, since there was clear implication there that the defendant was not willing to carry out the rest of its obligations without further assurances from the plaintiff that it could perform. It was also competent for the jury reasonably to have inferred that if the plaintiff had not, up to that time, demonstrated readiness to perform, this was caused by the defendant's previous default. Certainly, the jury could not reasonably have been expected to apply to the plaintiff a standard of conduct requiring it, in view of its limited capital and resources, to make firm commitments for the purchase of logs in substantial quantity when, without the specialized machinery which the defendant had undertaken to supply, it neither needed to nor could accept delivery. The issue as to who first committed the breach was clearly presented to the jury, and we find no merit in the exceptions taken to the court's instructions.

■■■ Brunswick's chief reliance is, however, upon evidence tending to show Foster's financial inability to perform if the defendant had not itself breached the contract. There is, apparently, no controversy as to controlling law. If a plaintiff is unable to perform it may not recover since it suffers no loss through the defendant's default. Petersen v. Wellsville City, 8 Cir., 14 F.2d 38. This the plaintiff impliedly concedes by allegations in its bill that it was at all times prior to the breach, willing, ready and able to carry out its obligations under the contract. In support of its contention that Foster could not, under any circumstances, have manufactured the blocks agreed upon, Brunswick points to its admittedly weak financial condition which ultimately, on March 18, 1941, resulted in an application by Foster to the Circuit Court for the County of Charlevoix,

for a voluntary dissolution and the appointment of a receiver. It points to the lack of timber in the vicinity of Charlevoix suitable for making pins, to Foster's failure to acquire and install the knee bolter, drag saw, and conveyor system which it had undertaken to supply.

There is evidence, however, that the knee bolter and drag saw were available and could promptly have been acquired. While the lack of a conveyor might have slowed the operation because of the difficulty of removing waste, it was not essential at the beginning of operations. There remains to be considered Foster's poor financial condition and its lack of credit rating. Though in November it had received $4125 from Stites, most of it was used to repay loans of money previously borrowed for the boat business. By December 11, plaintiff's cash was reduced to $392.91, and continued thereafter to shrink until at the time of receivership it was substantially exhausted. Salaries and current bills were in arrears, and but a few logs had been delivered at the plaintiff's factory. Though Foster had arranged for a credit at the bank it could be availed of only by giving the bank a lien upon logs purchased at the ratio of 10 to 7.

Foster argues that if all the machinery had been delivered by the 1st of December, it then had on hand enough money to carry on operations for a week, that this would have been sufficient for a start, after which performance would be financed by the payments to be made by the appellant immediately upon delivery of pin blocks. Brunswick undertakes to demonstrate the impossibility of such beginning, based upon Foster's own testimony that he needed 60,000 feet of logs to start with, and that these would cost him $30 per thousand. Having no credit, he could buy only for cash, and the bank would loan but three-fourths of this amount upon the security of the logs. He therefore needed $1800 to put in a sufficient bank of logs with which to begin operations, and this amount he did not have, either in the beginning or at any time during the contract period.

This demonstration, however, ignores Foster's main asset, which is the contract itself. That it was a contract highly profitable to Foster, if performed, is, upon this record, clear. The jury found it so notwithstanding its rejection of Foster's too optimistic estimate of profits. The bank was willing to take an assignment of the contract as security for advances, and Wallace was willing to invest $5,000 in the operation if Foster would agree to divorce the enterprise from the Foster Boat Company. The jury may well have found, in the light of general business experience and expectation, that one possessing a profitable contract to supply a financially sound buyer, and needing but a negligible amount of money for the beginning of an operation which thereafter would finance itself, had the financial ability to perform. It is true that the contract was not listed as an asset in the receivership proceeding, but this was after Brunswick's default, and the value of the contract inhered in performance, and not in its repudiation.

█ The final question in the case relates to Foster's proof of damages, the appellant contending that it was too vague and inadequate to support the judgment. It was not as detailed as that offered by the defendant in support of its counterclaim, but was, perhaps, as complete as the nature of the case would permit, since the plaintiff was not an experienced manufacturer of tenpins. It could furnish but an estimate of its production per man, and of its overhead costs. Its figure of 200,000 as the expected production of king-pins, the highest grade covered by the contract, corresponded with that of its more experienced adversary in its computation of damages on its own counterclaim. Its estimate of 100 pins per man per day was perhaps optimistic, but the defendant itself produced evidence that while production would be low in the beginning it might increase to as many as 160 per man per day. The jury was therefore not without some basis for measuring production. While the plaintiff's figures for overhead were obviously too low, there was no contradictory evidence on this score. Finally, though the plaintiff claimed damages in excess of $50,000, the verdict was for but a third of the claim, and this amount was further reduced by a remittitur required by the court as a condition for the avoidance of a new trial. Granting lack of precision in proof of damages, substantial damages were proven, and want of exactness will not justify setting aside the verdict when no unfairness therein appears. E. Rauh & Sons Fertilizer Co. v. Schreffler, 6 Cir., 139 F.2d 38.

██ Nor is the verdict void as a compromise. While it was less than the amount proved, this is not necessarily fatal. Joseph N. Smith & Co. v. Dickenson, 246 Mich.

689, 225 N.W. 580. The presumption is always in favor of the validity of a verdict if it is the result of an honest judgment. This is not a case where the plaintiff is entitled to all or nothing, as in Alden v. Sacramento Suburban Fruit Lands Co., 137 Minn. 161, 163 N.W. 133.

The judgment is affirmed.