## VAN SANT v. AMERICAN EXPRESS CO.
### No. 9044.

Circuit Court of Appeals
Third Circuit.

Argued April 15, 1946.
Reargued April 22, 1947.
Decided Oct. 21, 1947.

On Rehearing June 15, 1948.

Prior opinion 158 F.2d 924 vacated, and judgment of district court 61 F.Supp. 337, entered on directed verdict in favor of defendant, reversed and new trial granted for plaintiff, and case remanded with directions.

T. Edward O'Connell, of Washington, D. C., and Thomas D. McBride, of Philadelphia, Pa., for appellant.

Robert T. McCracken, of Philadelphia, Pa. (C. Russell Phillips and Richard E. McDevitt, both of Philadelphia, Pa., on the brief), for appellee.

Harry I. Rand, of Washington, D. C., for United States as amicus curiae.

Before McLAUGHLIN and O'CONNELL, Circuit Judges, and GOURLEY, District Judge.

GOURLEY, District Judge.

This matter comes before the Court on Petition for Rehearing filed by Frances Van Sant as appellant.

The plaintiff herein took an appeal to this Court on October 2, 1945, from the action of the District Court of the United States for the Eastern District of Pennsylvania, granting the motion of the defendant for a directed verdict in its favor and rendering judgment thereon. Oral argument on said appeal was held on the 15th day of April, 1946, and the judgment of the lower court was affirmed by this Court, and an opinion filed December 18, 1946. 158 F.2d 924. The Petition for Rehearing was granted on March 25, 1947, and the matter was heard by the Court on April 22, 1947.

It is contended by the plaintiff that the decision of this Court in affirming the judgment of the lower court was not decided in accordance with prior decisions of this Court, and controlling principles of law in the Commonwealth of Pennsylvania.

In this connection three propositions are urged by the plaintiff:

First: The plaintiff's evidence justifies a finding that the prosecution was instituted, at least in part, for a private end; hence, the burden of proof to show the existence of probable cause and lack of malice was on the defendant.

Second: The existence of probable cause is not tested as of the time when the complaint is filed and the prosecution initiated, or at the precise instant of arrest in all cases.

Third: Actual belief in guilt is an essential element of probable cause. If without actual belief in guilt any private person takes any affirmative act to further the prosecution, he is liable even though the prosecution was initated by himself or another with probable cause.

In affirming the judgment of the lower court in the first instance, it was held, in substance, that under the admitted or clearly established facts which existed on March 12, 1941, probable cause existed for the prosecution of the various complaints filed against Edna Frances Van Sant and, as a result thereof, it matters not whether the motives of the agents of the defendant company were praiseworthy or malicious, and it was the duty of the Court to enter a directed verdict in favor of the defendant. Van Sant v. American Exp. Co., 3 Cir., 158 F.2d 924.

This case is very unusual in that the action for malicious prosecution is based on several arrests of the plaintiff which it is claimed were instituted in behalf of, or at the request of the defendant. Specifically, the plaintiff alleged and offered evidence to prove—

(1) That she was arrested at the instance of the defendant, acting through its agents, servants and employees, on or about March 12, 1941, in the City of Baltimore, Maryland, said arrest being made on the basis of an information filed in the City of Philadelphia on March 12, 1941.

(2) That she was arrested and prosecuted at the instance of the defendant, acting through its agents, servants, and employees, for other offenses alleged to have been committed in Pittsburgh, Philadelphia and Upper Darby, Pennsylvania; Minneapolis, Minnesota, and Providence, Rhode Island.

Reference will be made to the background of this action in some detail in order that the subsequent discussion can be more clearly understood.

The plaintiff is a resident of Washington, D.C. The defendant, American Express Company, is an unincorporated association organized under the laws of the State of New York.

The plaintiff brought her action on the ground that the defendant falsely, maliciously and without probable or reasonable cause instigated a number of prosecutions against her in various state courts each of which was either abandoned or resulted in her acquittal. Specifically the plaintiff has alleged:

(1) She was arrested at the instance of defendant, acting through its agents, servants, or employees, on or about March 12, 1941, in the City of Baltimore, Maryland.

(2) At the instance of defendant she was brought to Philadelphia on March 13, 1941, where she was questioned by representatives of the defendant and members of the Police Department in the City of Philadelphia.

(3) She was questioned on March 14, 1941, while in the custody of the law, by representatives of the defendant, members of the Police Department in the City of Philadelphia, and presented for identification to numerous individuals who claimed they were defrauded.

(4) That she was arraigned before a magistrate on March 17, 1941 when a further hearing was requested by representatives of the defendant for the purpose of further investigation;

(5) That she was subjected to additional questioning by representatives of the defendant and members of the Police Department from March 13 to March 25, 1941;

(6) That on March 25, 1941, she was given a further hearing before a magistrate in the City of Philadelphia, in which she was charged with having committed offenses of false pretense, forgery, and uttering and publishing forged instruments;

(7) That after said hearing she was released on bail to appear at Philadelphia, Pittsburgh and Upper Darby, Pennsylvania;

(8) Said offenses were set forth to have occurred in Philadelphia, Pittsburgh and Upper Darby, all in the State of Pennsylvania;

(9) She was placed on trial in Pittsburgh on May 5th, and acquitted on May 7, 1941;

(10) Plaintiff's arrest was also caused by defendant on warrants issuing from Minneapolis, Minnesota, and Providence, Rhode Island, as a result of which she was imprisoned from April 14, 1941, until April 19, 1941, when she secured her release on bail;

(11) On or about May 15, 1942, plaintiff was extradited to Minneapolis, Minnesota, on the charges instigated by defendant as aforesaid, where, after being held in jail for about 15 days, she was released and discharged because the witnesses testified to her innocence;

(12) The charges preferred against her at Providence, Rhode Island, at the instance of the defendant aforesaid, were abandoned;

(13) On October 13, 1942, plaintiff appeared for trial in Media, Pennsylvania, for the offense alleged to have been committed in the Township of Upper Darby, Pennsylvania, and was acquitted and discharged of such charge on October 15, 1942;

(14) On April 28, 1943, plaintiff was tried and acquitted on the charges preferred against her in the City of Philadelphia.

A situation, therefore, arises where probable cause might be declared to exist in connection with one of the arrests or prosecutions, and would not be found to exist in connection with all.

The American Express Company deals in the sale, inter alia, of negotiable money orders and travelers checks. In the conduct of its business it maintains what amounts to a private police force called an Inspectors Department. The prescribed duties of this department are to cause the apprehension and prosecution of any persons thought to have committed offenses whereby the Company has sustained loss and thus to prevent and minimize future losses.

The head of that department is James J. Bulger, an officer who has the title of Assistant Vice President. Under his supervision there are various agents working in different parts of the United States and, perhaps, elsewhere.

In the year 1940 a gang of forgers was arrested in Cincinnati, Ohio, for fraudulent negotiation of travelers checks. The American Express Company cooperated in the arrest of that gang. The head of the gang was Wilbur Herbert Hartman. Among his accomplices were his wife, Pauline Hartman, Ruby Silber, and her husband, Carl Silber. At the trial Hartman was sentenced to prison for not less than one nor more than twenty years. The record of the present case does not show the exact disposition as to the others.

Bulger had full details on this gang not only because of the active cooperation of his department, but also because his agent, Charles C. Troyano, sent him a full report in June, 1940.

Then on January 2, 1941, sixty-three blank money orders of the American Express Company were stolen from a Western Union office at Columbus, Ohio, by a man who was never apprehended. Between January 3, 1941 and January 25, 1941, sixty-two of these money orders were negotiated

by a woman (or women) who would purchase certain female apparel, pay for it with one of these money orders filled in for the sum of $45, payable to and endorsed "Relda Hardman", receiving in each instance the amount of change in cash. Such orders were cashed on the dates and in the cities listed as follows:

January 6, 1941—Huntington, West Virginia.

January 11, 1941—Minneapolis, Minnesota

January 11, 1941—St. Paul, Minnesota

January 13, 1941—Buffalo, New York

January 15, 1941—Boston, Massachusetts

January 15, 1941—Providence, Rhode Island

January 17, 1941—Philadelphia, Pennsylvania

January 20, 1941—Pittsburgh, Pennsylvania

January 25, 1941—Indianapolis, Indiana

Bulger was informed of the loss on January 3, 1941. Upon presentation of these money orders for payment the American Express Company refused payment. Bulger assigned various agents to investigate, among them Jose T. Medina, who was in Buffalo, New York. On January 23, 1941, Medina reported to Bulger a description of the woman who had passed the money orders given him by an identifying witness. The description is as follows: "Age about 32 to 35; weight 125 lbs.; height, 5 feet, 5 inches; plump build; very good-looking; well dressed; had a gray fur coat three quarter size; light complexion, brown hair and brown eyes." This is an almost exact description of Pauline Hartman. Nevertheless, Bulger showed no concern nor did he take the trouble to check at that time on Pauline Hartman. There is no contention that Frances Van Sant had any connection with the Hartmans or Silbers.

The victims of these frauds complained to the police of the respective cities and gave various descriptions of the woman who victimized them. In Philadelphia the following complaints were received: On January 30, 1941, Louis Goldstein, Harry Goodman, and George Allen, Inc., complained that they had been defrauded. On February 11, 1941, a Miss Steiniger representing a store owned by T. Mogul, complained. On February 14, 1941, Charles David, Ladies Apparel Shop complained.

. Then on February 28, 1941, Bulger offered a reward of $100 for the apprehension of the plaintiff. On March 6, 1941, Bulger wrote to the Sheriff of Frederick County, Maryland, offering a reward of $100 for plaintiff's arrest and stating, "We will take a chance on getting a conviction."

Although those complaints had been made to the police of the City of Philadelphia, no suspicion was directed toward the plaintiff until about March 9 or 10, 1941, when a Mr. Potts, a Philadelphia employee of the American Express Company, came to Lieutenant John T. Murphy of the Philadelphia Detective Bureau and gave him a photograph of the plaintiff previously taken in Washington. Potts then told Murphy that his company had information that plaintiff might be the girl who passed the money orders. Then on March 12, 1941, Murphy received a call from Superintendent LeStrange of the Upper Darby police who said that he had received a telegram from the American Express Company advising him that plaintiff would appear in the Baltimore Police District and that she might be the person who passed the checks. Murphy communicated this information to Potts who said he would contact his superior, Mr. Bulger, in New York. Potts later returned to Murphy, told the latter that he had contacted Bulger, suggested that a warrant be obtained, and that a telegram should be sent to the Police Department of Baltimore requesting them to arrest plaintiff. This was done. Potts then later said that Bulger would like to accompany the detectives to Baltimore to apprehend plaintiff and that Bulger agreed to pay the expenses. Lieutenant Murphy had stated that the City of Philadelphia "does not defray expenses in private prosecutions."

Murphy directed one of his detectives, Francis J. Galen, and a female employee of the police department to go to Baltimore with Bulger. At Baltimore they met plaintiff who had been apprehended by the police of that city as a result of the telegram and Bulger requested that she permit a search of her belongings. She readily ac-

quiesced and when informed that she was charged with fraudulently passing a money order in Philadelphia, waived extradition, denied the charge, and agreed to return voluntarily. All her belongings were packed and brought back with her. Bulger, who claimed forty years experience in such matters, questioned her during the return journey. She again denied knowing anything about any money orders. She gave him a detailed statement as to her movements during the period in which the money orders were negotiated, the names and addresses of people who could prove her innocence, and denied ever being in any of the cities where the money orders were negotiated except Philadelphia on one occasion in 1940.

Upon her arrival in Philadelphia she was lodged in a city hall cell room. Bulger again questioned her for three hours.

The Philadelphia victims were sent for so that they might be able to identify her. All her clothing and property were searched by the witnesses to ascertain whether any of the articles which had been purchased was among them, but nothing was identified. On March 14, 1941, nine or ten possible witnesses together with Bulger were present. The witnesses' personal concern was evidenced by their asking who was going to pay them for their loss of $45. Although they had sustained the loss two months prior thereto, the American Express Company had not yet reimbursed them. Bulger then promised them that they would all be paid.

There was no line-up. Outside of a few detectives and the witnesses, plaintiff was the only girl in the room. Even so, five or six witnesses said she was not the guilty person. All the rest at first seemed doubtful. Mr. Goodman first said she was not the girl, then changed his mind after a discussion with his wife in the hallway and when they came back, both identified her. Miss Goralick first "hedged on the identification" then finally said she was the girl. Miss Goldstein, who was with Miss Goralick at the time the money order was passed, said she could not identify plaintiff. Miss Steiniger, who at first seemed uncertain, after a twenty minute pause finally identified her. A Mr. Everett first identified her and then definitely stated she was not the woman.

On March 14, 1941, Lieutenant Murphy, who was still in charge of the case, said to Bulger, "I think you have the wrong girl." Bulger responded, "I know I got the right girl because I have proof." Plaintiff was arraigned before a magistrate on March 17, 1941, when a further hearing was requested for investigation.

In the meantime Lieutenant Murphy caused a check to be made of the statements given to him by the plaintiff. She was questioned about eight hours a day from March 13 until March 25. She stated that she was not out of the City of Washington between late November, 1940, and January, 1941; that she had been in Philadelphia only once in her life; and told of a visit to her mother in Everett, Pennsylvania, subsequent to January 25, 1941. She referred the police to the persons with whom, and the address at which, she lived. The official police investigation corroborated plaintiff's story in every detail. Just prior to the further hearing on March 25, 1941, and as a result of an intense official investigation, Detective Galen told Mr. Collins, who together with Bulger conducted the case for the American Express Company, that plaintiff was innocent and she should not be prosecuted. Bulger insisted that the prosecution go forward. She was held for court on March 25, 1941, under $300 bail for the Philadelphia charges; $300 for the Pittsburgh charges; and $300 for the Upper Darby charges. Later she furnished bail and was released.

About March 17, 1941, Lieutenant Murphy at the written request of Bulger had taken specimens of plaintiff's handwriting which he forwarded to Bulger. Early in June Bulger submitted these specimens to Jesse Pelletreau, an alleged handwriting expert employed by the American Express Company, from Kearny, New Jersey.

On May 8, 1941, plaintiff was tried in Pittsburgh. After the evidence was concluded the jury retired to consider its verdict. Due to the lateness of the hour they sealed their verdict and it was to be announced the following day in open court. She was acquitted. After the verdict was

announced in open court, plaintiff was taken into custody on "new" charges. At this trial of May 8, 1941, in addition to the witnesses covering the specific charges actually on trial, other witnesses testified to other similar alleged transactions not covered by the indictments. After her acquittal these alleged transactions were made the basis of additional indictments.

After plaintiff's acquittal in Pittsburgh Bulger caused an investigation to be made of plaintiff in Washington, D. C., as well as a handwriting expert, one Ira Gullickson, who had appeared on her behalf and who was, and still is, connected with the Metropolitan Police Department of Washington, D. C. The investigation was made by Jose T. Medina, the same man who had previously investigated the passing of some of the money orders in Buffalo, and who had given Bulger a description of the guilty woman which fitted Pauline Hartman and which was very different from that of plaintiff. On May 29 and 30, 1941, Medina wrote Bulger that he had investigated Mr. Gullickson and found him entirely reliable; that he had investigated the whereabouts of plaintiff in the crucial period of January, 1941, and had found she was telling the truth. During the investigation Medina interviewed Mr. Gullickson and told him that he had ten affidavits that plaintiff was innocent; that she had been in Washington at the time the money orders were negotiated in other cities; and that he was so reporting to Bulger. He also said that Pauline Hartman and "Relda Hardman" were one and the same person.

Shortly thereafter plaintiff was called for trial in Media, Pennsylvania, for the offense alleged to have been committed in the Township of Upper Darby, Pennsylvania, but Medina appeared and had the case continued. Thereafter he rode back to Philadelphia with plaintiff in an automobile, and told her that he was convinced of her innocence and that Pauline Hartman was actually the guilty person and that plaintiff would hear from him later.

Bulger wrote a letter on August 23, 1941, to Inspector Monaghan of Pittsburgh accompanying it with a photograph of Ruby Silber, Pauline Hartman's associate, and stated that it was his opinion that Ruby Silber was the person who was guilty of the offenses committed in Pittsburgh, for which plaintiff had been tried as well as those still pending. It will be remembered that he knew of Ruby Silber as well as Pauline Hartman and their connection as members of the same gang of forgers since 1940, which was before this case ever started.

The next case which came to trial was in Philadelphia, commencing November 24, 1941. On November 26, 1941, a juror was withdrawn and the case continued. Despite Bulger's statement that Ruby Silber was guilty of the Pittsburgh offense and that all endorsements contained the name "Relda Hardman" including those in Philadelphia, and some of them were signed in the presence of Philadelphia witnesses, Bulger paid the handwriting expert, Pelletreau, $50 a day to come to Philadelphia to testify that plaintiff had signed the name "Relda Hardman".

The next trial took place in Pittsburgh on December 8, 1941. At the first trial in Pittsburgh the Commonwealth had a handwriting expert in court, one Nernberg, but he did not testify. At the second trial in Pittsburgh the Commonwealth's handwriting expert did not even appear but in his stead, Pelletreau, the American Express Company's expert, testified for the Commonwealth despite Bulger's statement made a few months before that plaintiff was not guilty. The jury convicted plaintiff and she was sentenced to imprisonment for not less than six months nor more than one year. After she had served five months she was taken from the jail, placed on parole, and held to await extradition by the authorities of Minneapolis, Minnesota. This conviction in Pittsburgh has not been included in the cause of action for malicious prosecution.

Although the money orders had been passed during January, 1941, no suspicion was directed against plaintiff in the City of Minneapolis, Minnesota, prior to May of 1942 when a photograph of her was sent to the authorities in said city by the defendant.

In Minneapolis a Miss Dill identified this photograph and extradition was requested.

When the extradition proceedings were completed, plaintiff was turned over to Oscar Hollison, a police officer from Minneapolis, who took her to that city on May 13, 1942. When they arrived there Officer Hollison sent out for witnesses from both Minneapolis and St. Paul. Twenty such witnesses appeared. All of them except Miss Dill stated that she definitely was not the person. Miss Dill, upon a casual glance, said that she looked like the person, but on closer inspection certified that she was not. There being no evidence whatever against plaintiff in Minneapolis, and authorities there having held her from May 14 to June 2, and the authorities of Pennsylvania having failed to send for her, she was released on habeas corpus; whereupon she voluntarily came back to Pennsylvania to face charges.

On October 13, 14, 15, 1942, she was tried in Media, Pennsylvania, for the offense alleged to have been committed in the Township of Upper Darby, Pennsylvania. Witnesses were also called from Philadelphia County who were presented to testify as to similar crimes. She was acquitted in that trial.

On March 16, 1943, she was again placed on trial in the City of Philadelphia, where for a second time a juror was withdrawn and the case continued. In connection with the Philadelphia prosecution, General Counsel of defendant (New York law office) retained Philadelphia Counsel—a former Assistant District Attorney, who was present at the trial.

On April 28, 1943, she was again placed on trial in Philadelphia and confronted the witnesses against her. Mr. Pelletreau did not appear but Mr. Gullickson did as did also Leon W. Melcher, Esq., Philadelphia handwriting expert, both of whom testified on her behalf. She waived a jury trial and was acquitted by the Court.

Other cities like Providence, Rhode Island, which had previously expressed interest in plaintiff, abandoned all concern and she was ultimately discharged of any connection with these matters.

It appears from a careful reading of the record that the only testimony as to the date in which an information was lodged against the accused is March 12, 1941, which was the time of the filing of the information in the City of Philadelphia. On March 25, 1941, when the accused was bound over for court, she was required to post bond for proceedings pending in the cities of Pittsburgh and Philadelphia, Pennsylvania, and the Township of Upper Darby, Pennsylvania. She was subsequently required to answer proceedings filed in the City of Minneapolis, Minnesota. She also was detained to some extent for investigation in connection with offenses alleged to have been committed in the City of Providence, Rhode Island. In all of the cases just mentioned, it does not appear in the testimony as to what dates informations were lodged against the accused, or the periods of time she was detained in connection with each separate proceeding.

This civil action, therefore, results or is based on prosecutions which were lodged against Frances Van Sant in the cities of Philadelphia and Pittsburgh, Pennsylvania, the Township of Upper Darby, Pennsylvania, the City of Minneapolis, Minnesota, and the City of Providence, Rhode Island.

■ Since this is a diversity of citizenship case, the conflict of laws rule to be applied must conform to that prevailing in the courts of the state wherein the district court sits. Otherwise, the accident of diversity of citizenship would constantly disturb equal administration of justice in co-ordinate state and federal courts sitting side by side. Klaxon v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477; Guaranty Trust Co. v. York, 326 U.S. 99, 65 S.Ct. 1464, 160 A.L.R. 1231, 89 L.Ed. 2079; Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487; Conflict of Laws in the Federal Courts: The Erie Era, by Paul A. Wolkin, 94 Univ. of Pa. L. Review 293 (1946).

■ It is thoroughly established as a general rule that the lex loci deliciti, or the law of the place where the tort or wrong has been committed, is the law that governs and is to be applied with respect to the substantive phases of torts or the actions therefor, and determines the question of whether or not an act or omission gives rise to a right of action for civil liability for tort.

Pennsylvania falls within the majority or general rule just expressed. 15 C.J.S., Conflict of Laws, § 12, subsec. a; Builders Supply Co. v. McCabe, 353 Pa. 107, 44 A.2d 256.

In view of the various arrests it is, therefore, necessary to apply the law of the state in which the prosecution was made of the accused in determining whether the action for malicious prosecution has been proved.

The first real question, therefore, is whether or not there is evidence in the record to show that this prosecution was instituted for a private end, gain or advantage by the defendant, through its servants, agents or employees, as to the proceedings which were instituted in the Commonwealth of Pennsylvania.

The evidence in the present case as to private end, gain or advantage in the initiation of the criminal proceedings is as follows:—

The testimony of Mr. Clarkson, Chairman of the Board is as follows:

"Q. And do you know Mr. Bulger? A. Yes.

"Q. And what is his title or occupation? A. I would say he was head of the Inspection Division.

"Q. Is the Inspection Division concerned with the prevention or recurrence of any losses by theft that the American Express Company might sustain? A. I would say they look into those matters.

"Q. They do, and that would be one of the duties of Mr. Bulger and also of Mr. Collins? A. Yes."

Mr. Reed, President of the defendant company, after stating that Mr. Bulger was Assistant Vice President, an appointed officer, in charge of the Inspector's Department rather than the Inspection Division, testified as follows:

"Q. Inspector's department, all right. Now let me ask you this: Are the duties of those in, or in charge of, the inspector's department to cause the apprehension of persons who are thought to have committed offenses whereby the American Express Company has sustained losses? A. That is their responsibility.

"Q. And is it also their responsibility to prevent, if possible, recurrence of any such losses? A. Yes.

"Q. As president do you supervise the work of the inspector's department? A. I direct it."

Bulger's testimony on this point, which was given through his deposition and which was read into the record, is as follows:

"Q. When did you start an investigation into the matter? A. After the first money order was returned.

"Q. When was that, if you remember? A. I don't remember.

"Q. Well was it within a week, would you say, of January 2? A. Probably about the 10th.

"Q. And am I correct in saying that those money orders kept coming in from various cities between January 2 and about January 27? A. About January 30—January 2 to January 30.

"Q. And did you assign anyone else to investigate the matter? A. Yes.

"Q. Who? A. Our special agent in Chicago.

"Q. His name, please? A. H. C. Eldredge.

"Q. Who else? A. And our district manager at Philadelphia, Thomas E. Greenwood.

"Q. Now what aspects of the investigation did you assign to Mr. Eldredge? A. To get information concerning their acceptance in Minneapolis and St. Paul.

"Q. And to what aspect did you assign Mr. Greenwood? A. To contact the Philadelphia police.

"Q. Did you get a report from Mr. Greenwood to the effect that he had? A. Yes.

"Q. And which policemen did he contact? A. Lt. John Murphy.

"Q. Who was then in charge of the so-called Bad-Check squad? A. I don't know what his position was.

"Q. Well, did you know that he was a Lieutenant in the Detective Bureau? A. Yes.

"Q. From the time he was contacted, was he in charge of any police investigation into the matter? A. I don't know.

"Q. Did you personally talk with Lieutenant Murphy? · A. Yes.

"Q. When did you first see Lieutenant Murphy? A. March 13.

"Q. 1941? A. 1941.

"Q. Now let me ask you this: Is it your usual practice to cause investigations into thefts whereby the American Express Company has suffered or sustained a loss? A. Yes.

"Q. And are you the person in charge of such investigations for the company? A. Yes."

■ There is no question that the plaintiff has the burden of proof in connection with the obligation to show want of probable cause for having been prosecuted. Though this proof is a negative one, the burden is on the plaintiff to prove it affirmatively. Altman v. Standard Refrig. Co., Inc., 315 Pa. 465, 477, 173 A. 411; O'Neill et al. Aplnts., v. Metropolitan Life Ins. Co., 345 Pa. 232, 241, 26 A.2d 898, 142 A.L.R. 735.

In the trial of this case, the defendant did not rest on the testimony offered by the plaintiff, and made no motion for judgment of dismissal or the entry of a non-suit at the completion of the plaintiff's testimony. In the presentment of the defense and during the cross-examination of J. J. Bulger, the Assistant Vice President and individual in charge of the Inspection Division of the defendant company, he testified as follows:

"Q. You, of course, as the inspector, are in charge of checking on all these stolen, forged money orders; is that right? A. Yes, sir.

"Q. That is your duty? A. Yes, sir.

"Q. It is up to you to see that these cases are vigorously and fairly prosecuted to protect your money and bring it in the open to show how you go after anybody that tampers with them; is that correct? A. That is the desire of the management of the American Express Company, and my desire, also."

■ It was the duty of the lower court in passing upon the motion of the plaintiff for a new trial to consider the testimony in a light most advantageous to the plaintiff. All conflicts therein must be resolved in the plaintiff's favor, and the plaintiff must be given the benefit of every fact and inference of fact pertaining to the issue involved which may be reasonably deduced from the evidence. Flowers v. Dolan, Adm'x, Aplnt., 155 Pa.Super. 378, 38 A.2d 429; Bauer, Adm'x, v. Sacks, Aplnt., 355 Pa. 488, 50 A. 2d 351; Cyclopedia of Federal Procedure, 2d Ed., Vol. 8, Section 3463, p. 124; Brunswick-Balke-Collender Co. v. Foster Boat Co., 6 Cir., 141 F.2d 882; Worcester et al. v. Pure Torpedo Co., 7 Cir., 140 F.2d 358; Hellweg v. Chesapeake & Potomac Tel. Co., 110 F.2d 546, 71 App.D.C. 346.

■■ In considering whether or not the trial court erred in directing a verdict in favor of the defendant, it is, therefore, the duty of the Court to consider all the testimony which has been introduced, both by the plaintiff and the defendant. This is true for the reason that although the plaintiff had the burden of proving want or lack of probable cause for the various prosecutions, a party may be relieved of the burden imposed upon him by the fact that the necessary proof is introduced by his adversary. Otto, Adm'x, Aplnt., v. Western Saving Fund Society, 343 Pa. 615, 621, 23 A.2d 462; 20 American Jurisprudence 140, Sec. 135.

■ The law of Pennsylvania on the question of private gain, end or advantage seems to be clearly expressed in the case of Curley, Aplnt., v. Automobile Finance Co., 343 Pa. 280, 23 A.2d 48, 53, 139 A.L.R. 1082.[1]

---

[1] "In the trial of cases the 'general rule' is that the jury is the trier of questions of fact. In cases of malicious prosecution this rule (unless the circumstances hereinafter noted are present), does not prevail, for in such cases the trial judge and not the jury determines whether or not the prosecutor in the criminal case (i.e., the defendant in the civil action trying) had an honest and reasonable belief in the existence of a probable cause for the prosecution's initiation. However, where there is evidence from which the jury in the action for malicious prosecution may legitimately infer that the prosecutor's hope of private gain had a

The question which faces the Court is whether there is evidence from which the jury in this action for malicious prosecution may legitimately infer that the prosecutor's hope for private gain, end or advantage had a part in the initiation of the criminal proceedings which gave rise to the action.

The question of private advantage which we believe is synonymous to private gain or end has been considered in the Restatement of the Law of Torts, 3d Vol., Para. 668, subsection g, p. 425.[2]

■ It is definitely the rule of law in the Commonwealth of Pennsylvania that the element of private gain, end or advantage exists where a prosecution is initiated in a criminal proceeding, in whole or in part, to collect a civil debt or to enforce a civil right. Curley, Aplnt., v. Automobile Finance Co., supra; Johnson v. Brotherhood of R. Trainmen, 3 Cir., 147 F.2d 683; MacDonald v. Schroeder, 214 Pa. 411, 63 A. 1024, 6 L.R.A.,N.S., 701, 6 Ann.Cas. 506.

■ It must be kept in mind that where the hope of private gain, end or advantage can be legitimately inferred from the initiation of criminal proceedings which give rise to the action, such an inference is not in itself conclusive on the question of probable cause. It simply creates prima facie evidence of the want of probable cause, and casts upon the defendant a burden of going forward with evidence to establish that probable cause did exist. Curley, Aplnt., v. Automobile Finance Co., supra.

What, therefore, is the meaning of the word "gain"?[3]

part in the initiation of the criminal proceedings which gave rise to the action, the 'general rule' prevails and the jury decides the pivotal question of fact."

[2] g. Private advantage. Since the only proper purpose for which criminal proceedings can be initiated is that of bringing an offender to justice and thereby aiding in the enforcement of the criminal law, it follows that one who initiates such proceedings to force the accused to pay money or to turn over land or chattels to the accuser, does not act for a proper purpose. This is so although the money is lawfully owed to the accuser or the thing in question has been unlawfully withheld or taken from him, so that relief might have been secured in appropriate civil proceedings. It is also true, although the accuser believes that the manner of taking or withholding the thing is such as to constitute the crime charged in the proceedings. Nevertheless, if the accuser's belief in the criminal character of the accused's conduct is reasonable, the proceedings and the existence of an improper purpose is not enough to make him liable (see Comment b). So too, the accuser may escape liability by proving that the taking or withholding of the thing in question was such as to make the accused guilty of the crime charged against him under the rule stated in Para. 657.

A usual situation involving the existence of an improper purpose of the kind above described is where a creditor seeks to enforce the payment of a debt by initiating proceedings in which the debtor is charged with obtaining money under false pretenses. Criminal proceedings may also be brought for the purpose of compelling the accused to relinquish the possession of land to which the accuser claims to be entitled. The accuser may also seek by criminal proceedings the restoration of goods which the accused has tortiously withheld. Other situations may arise in which criminal process is improperly used to accomplish ends for which civil process is provided.

"Illustration: 1. A statute of state X makes it a criminal offense to remove chattels from the state for the purpose of defrauding a vendor who holds a conditional bill of sale. A, an automobile finance company, initiates a prosecution under this statute against B for the purpose of forcing him to pay installments in arrears. The purpose of the prosecution is improper."

[3] Webster's New International Dictionary, 2d Edition, defines "gain" as follows:

Gain, n. advantage; convenience; remedy. Increase or addition to what one has of that which is of profit, advantage or benefit. Act of gaining something; esp., the obtaining or amassing of profit or valuable possessions; acquisition; accumulation. Any increase of value, whether from business transactions or mere advance in value or increase of capital. Increase in resources or business advantages resulting from business transactions or dealings. Profits in the form of sums of money or acquired assets arising from business transactions or dealings.

Gain, v. To get by an exercise of initiative; to acquire; obtain; procure; secure; primarily, to get (a profit or advantage) as by earning; as, to gain a living. To reach; to attain to; to arrive at; as, to gain the top. To secure

Where there is no conflict in the testimony as to the circumstances under which the defendant acted in initiating criminal proceedings against the party, or the circumstances are admitted by the parties, or the evidence is clear and uncontradicted, there is no need for a finding of the jury as to the facts upon which the existence or non-existence of probable cause is to be based. Under any of the circumstances just mentioned, the question of want of probable cause in a criminal prosecution which gives rise to a civil action is a question not for the jury but for the court. Simpson v. Montgomery Ward & Co., 354 Pa. 87, 46 A.2d 674; Campbell v. Yellow Cab Co., 3 Cir., 137 F.2d 918.

The plaintiff contends that the inferences which can be drawn from the testimony as to the hope of private gain, end or advantage, on the part of the defendant in the making of prosecutions, is not clear from doubt. As a result thereof, question of the existence or nonexistence of the hope of private gain, private end or private advantage is a question for the jury to resolve. Cooper v. Electro-Tint Engraving Co., Aplnt., 70 Pa.Super. 517; Campbell v. Yellow Cab Co., 3 Cir., 137 F.2d 918; Angeloni v. Lederer et al., Aplnts., 89 Pa.Super. 383.

Hence, if the plaintiff in the present case has shown that the defendant initiated any of the prosecutions which were made in the Commonwealth of Pennsylvania, and that part of its purpose in so doing was for private gain, end or advantage, and the protection of its own business interests or the negotiability of its own commercial paper or for any other private purpose, three results would follow:

1. Prima facie evidence of want of probable cause exists;

2. Although there be no further proof by the plaintiff that the defendant acted without probable cause and with malice, nevertheless there can be no judgment for the defendant because the burden of proof would shift to the defendant to show the existence or presence of probable cause; and

3. The factual question of probable cause is to be determined by the jury and not by the court.

Although the law does not conclusively presume malice from want of probable cause, when the plaintiff's evidence justifies a finding that private interest played a part in the prosecution, this is prima facie evidence of malice or want of probable cause. MacDonald v. Schroeder, supra; Curley, Aplnt., v. Automobile Finance Co., supra.

Is it, therefore, private gain, end or advantage to protect the negotiability of said money orders? Does this help to establish or increase the goodwill of the defendant? One of the officers of the defendant testified that the United States Post Office Department had adopted the method of negotiating money in the manner used by the defendant. It is logical to infer that an element of competition did exist since the defendant is not the only company or agency which is engaged in this type of business.

The defendant had the right to operate the Inspection Department, whose duty it is to cause and conduct investigations when it is felt that the same are necessary to protect the company from financial losses presently or in the future. However, if through the Inspection Department of the defendant, activities are allowed to occur which infringe on the rights of an individual, the defendant should be held answerable if the element of private gain, private end or private advantage exists.

We believe that the evaluation of the facts as to whether or not the hope of private gain, end or advantage had a part in the initiation of the criminal proceedings is such that the inferences to be drawn from the testimony are not clear from doubt.

advantage or profit; to acquire gain; to advance in interest, health, or happiness; to make progress; as, the sick man gains daily.

37 C.J.S., page 1421, defines "gain" as follows: "Gain. A generic term referring to whatever is obtained from the use of property, and defined as profits, that which is acquired or comes as a benefit, profits or something of exchangeable value, proceeding from property separate from capital. It sometimes signifies the difference between the receipts and expenditures, * * *; and imports ordinarily an element of chance, venture, or business hazard. * * *"

Fair-minded men may draw different inferences and since there is a reasonable basis in the record for inferences to be drawn that the prosecutions were made for the hope of private gain, end or advantage, we do not believe it was within the province of the trial court to weigh the conflicting inferences and substitute its judgment to that which should be rendered by the jury. Cooper v. Electro-Tint E. Co., Aplnt., supra; Campbell v. Yellow Cab Co., supra; Angeloni v. Lederer et al., Aplnts., supra; Lavender, Adm'r, v. Kurn et al., 327 U.S. 645, 653, 66 S.Ct. 740, 90 L.Ed. 916.

■ We are, therefore, of the opinion that the evidence introduced by the plaintiff requires submission to the jury the question as to whether one or all of the prosecutions involved in this action were instituted, at least in part, for a private gain, end or advantage by the defendant.

As a result thereof, if such an inference is drawn, the prima facie evidence creates a presumption of fact that the prosecutions, one or all, were made without probable cause and with malice. This would, therefore, shift the burden of proof to the defendant to show the existence of probable cause and lack of malice.

The plaintiff also contends that the existence or want of probable cause should not be tested as of the time when the criminal complaint is filed and the prosecution initiated, or at the precise instant of arrest in all cases.

It is argued that in Campbell v. Yellow Cab Co., supra, the question of probable cause was not considered on the date of the arrest, but as of the date when the representative of the Yellow Cab Company, acting in behalf of the defendant, implicated the accused or caused the prosecution to be continued.

In the case just referred to, the defendant's representative had no concern in the instigation of the prosecution in the first instance, and as a result thereof the question of probable cause was confined to a subsequent date when a representative of the Yellow Cab Company at the time of preliminary hearing requested that the defendant in the criminal proceeding be further detained.

■ We believe it should be for the jury to determine under proper instructions from the Court whether—

(a) One or all of the criminal complaints or prosecutions were initiated at the instigation or request of the defendant;

(b) The plaintiff was arrested and taken into the custody of the law in one or all of the proceedings at the instigation or request of the defendant;

(c) The plaintiff was detained subsequent to arrest in one or all of the proceedings at the instigation or request of the defendant;

(d) The plaintiff was bound over for court to answer said charges in one or all of the proceedings at the instigation or request of the defendant;

(e) The defendant took an active part or concern in pressing the proceedings to final disposition after the plaintiff was bound over and held for court to answer said charges.

After these questions have been answered, it will then be the duty of the jury to answer by interrogatories under proper instructions from the Court whether probable cause existed on the part of the defendant to—

(a) Prosecute or file the complaints;

(b) Arrest or have the plaintiff placed in the custody of the law;

(c) Have the plaintiff detained subsequent to arrest;

(d) Have the plaintiff bound over for court to answer said charges;

(e) Take an active part or concern in pressing the cases to final determination.

If this procedure is followed, the existence or want of probable cause will be determined by the jury as of the time it is found the defendant had any part or concern in one part or the other of one or all of said proceedings.

It is furthermore contended by the plaintiff that actual belief in guilt is an essential element of probable cause. If without actual belief in guilt any private person takes any affirmative act to further the prosecution, he is liable even though the prosecution was initiated by himself or another with probable cause.

It is, in substance, the contention of the plaintiff that a question for the jury exists as to whether or not the defendant had an honest and reasonable belief in the existence of probable cause at the time the first prosecution was instituted on March 12, 1945, and on the dates the subsequent criminal proceedings were instituted; and also, if the defendant had an honest and reasonable belief in the existence of probable cause on March 25, 1941, when the accused was bound over for court on the first prosecution of March 12, 1941, and on the dates the accused was bound over for court on the subsequent prosecutions.

Honest and reasonable belief in the guilt of the accused is an essential element of probable cause. Restatement of the Law of Torts, 3d Edition, Section 662(c); Perginsky v. Moskowitz, 92 Pa.Super. 318; Curley v. Automobile Finance Co., supra.

If the prosecutor does not actually believe in the guilt of the accused, it is immaterial that the facts (of which he had knowledge or belief) were such that reasonable men might have regarded them as proof of the guilt of the accused.

The Restatement of Torts, Vol. 3, Sec. 655, states that a private person who initiates criminal proceedings against another upon probable cause and for a proper purpose but thereafter takes an active part in pressing the proceedings after discovering that there is no probable cause therefor is liable. His share in continuing the prosecution is active if he insists upon, urges or assists in further prosecution unless such assistance is merely attending as a witness. Lack of actual belief in the guilt of the accused at the time affirmative action is taken is itself evidence of want of probable cause and of malice.

We believe that the evidence in the record presents a question for the consideration of the jury as to whether or not the defendant had a hope or belief of private gain, end or advantage in the institution of one or all of the prosecutions under the law of the Commonwealth of Pennsylvania.

Since the record is so indefinite as to the circumstances in connection with the of-fenses alleged to have been committed in the states of Minnesota and Rhode Island, it is not possible to apply the facts to the law of those states.

It will, therefore, be necessary in the retrial of this civil action for proof to be offered as to the dates that the informations were lodged against the defendant, the time that she was placed in the custody of the law, the date that she was bound over or held for court, and proof that the defendant, either directly or indirectly, instigated said prosecutions or was responsible in connection therewith.

After these facts have been established, it will be the duty of the trial judge to apply the law of Pennsylvania in connection with the proceedings which occurred in this Commonwealth, and to apply the law of Rhode Island and Minnesota which will govern the proceedings in those jurisdictions.

It will also be proper for the trial judge to instruct the jury that it will be for them to determine, if they find probable cause to exist in connection with the first prosecution, whether this conclusion justified the formulation of the belief by the defendant that probable cause existed for the subsequent prosecutions. Macauley, Respondent, v. Theodore B. Starr, Inc., Aplnt., 194 App.Div. 643, 650, 186 N.Y.S. 197.

It would make for a just verdict in this case if the trial judge would submit to the jury questions for special findings as to said basic facts. See Restatement, Torts, Sec. 673, Comment d; Federal Rules of Civil Procedure, rule 49(a), 28 U.S.C.A. following section 723c.

Among the basic facts to be submitted, there should be included the following:

1. Was the defendant, through its servants, agents or employees, the instigator of the lodging of the criminal proceeding on March 12, 1941?

2. This question should also be answered as to the other prosecutions which were initiated in Pennsylvania, Minnesota and Rhode Island.

3. Did the defendant, through its servants, agents or employees, cause the accused

to be bound over for court on March 25, 1941?

4. This question should also be answered in connection with the other prosecutions in which the accused was bound over for court in Pennsylvania, Minnesota and Rhode Island.

5. Did the hope of private gain, end or advantage have a part in the initiation of the criminal proceeding by the defendant on March 12, 1941?

6. This question should also be answered as to the other prosecutions which were instituted in Pennsylvania, Minnesota and Rhode Island.

7. Did the hope of private gain, end or advantage have a part on behalf of the defendant in the accused being bound over for court on March 25, 1941?

8. This question should also be answered as to the other prosecutions in which the accused was bound over for court in Pennsylvania, Minnesota and Rhode Island.

9. Did the defendant, through its servants, agents or employees, honestly and reasonably believe that probable cause existed for the prosecution's initiation on March 12, 1941?

10. This question should also be answered as to the other prosecutions which were initiated in Pennsylvania, Minnesota and Rhode Island.

11. Did the defendant have honest and reasonable belief that probable cause existed for the prosecution's continuance on March 25, 1941 when the accused was bound over for court?

12. This question should also be answered as to the other prosecutions in which the accused was bound over for court in Pennsylvania, Minnesota and Rhode Island.

We believe these special findings are also necessary for the reason that if probable cause is found to exist on March 12, 1941, and after discovery of factual circumstances which indicate that the accused was not guilty of the crimes charged, it is found that the defendant proceeded with the prosecution, the liability of the defendant would be confined to the harm caused the accused from the date that it would be ascertained that the defendant continued to act where the lack of probable cause existed.

The comment just made would also have application to the other prosecutions which were initiated subsequent to March 12, 1941, in Pennsylvania, Minnesota and Rhode Island.

It is impossible for this Court to outline in detail the great responsibilities that exist with the trial judge in the submission of special findings to the jury in order to make possible a definite answer or finding to the many questions which exist in this proceeding. We believe the suggestions made herein will prove of considerable assistance but we do not want it to be interpreted that the suggestions just made should close the door to other considerations. We hope that the ideas expressed will be followed with such additional special findings as the trial judge and counsel feel and believe will help to bring about a fair and impartial adjudication of the many issues of fact which exist.

In view of the conclusion which has been reached, the previous decision and opinion of this Court will be vacated, and the judgment of the lower court entered upon the directed verdict in favor of the defendant will be reversed and a new trial granted for the plaintiff. The case will be remanded for further proceedings not inconsistent with this opinion.

### On Rehearing.

McLAUGHLIN, Circuit Judge.

Appellee in its petition for rehearing attacked for the first time appellant's allegation in her complaint of District of Columbia residency as a basis for diversity of citizenship. We allowed rehearing on the jurisdictional point thereby raised. Appellant then moved to amend her complaint to show that she had been a resident of Virginia at the time suit was started and filed a detailed affidavit in support of her contention. Appellee opposed the motion, and, alternatively, in the event of its allowance, sought to amend its answer by: (1) Denying the Virginia residence averment on information and belief; (2) Setting forth lack of diversity because the complaint did

not allege any place of citizenship or residence of the defendant; (3) Pleading the Pennsylvania one year statute of limitations.[1] Next, the appellant applied to amend her complaint to expressly state that appellee is a joint stock association organized under the laws of the State of New York. Lastly, appellee moved to dismiss that motion.

The motions to amend the pleadings to show the facts regarding the diverse citizenship basis of this action are properly before us under Section 274c of the Judicial Code, 28 U.S.C.A. § 399, which reads: "Where, in any suit brought in or removed from any State court to any district of the United States, the jurisdiction of the district court is based upon the diverse citizenship of the parties, and such diverse citizenship in fact existed at the time the suit was brought or removed, though defectively alleged, either party may amend at any stage of the proceedings and in the appellate court upon such terms as the court may impose, so as to show on the record such diverse citizenship and jurisdiction, and thereupon such suit shall be proceeded with the same as though the diverse citizenship had been fully and corectly pleaded at the inception of the suit, or, if it be a removed case, in the petition for removal. (Mar. 3, 1915, c. 90, 38 Stat. 956.)"

Appellant's affidavit in support of her motion to amend her residency allegation sets out that no change is attempted as to the actual location of her residence and that the mistake in connection with this arose from the incorrect assumption that the street address thereof was in the District of Columbia instead of in Alexandria, Virginia, as it really is. Appellant's facts are not contradicted by appellee though her personal veracity is questioned by allusion to her residency answers on cross examination and the residency statements in the complaint. Under the circumstances, appellant is entitled to amend her complaint to show that she was a resident of Virginia at the time she brought her suit and appellee is entitled to deny this in its answer. Keene Lumber Co. v. Leventhal, 1 Cir., 165 F.2d 815, 819. In view of our above conclusion there is no necessity at this time for passing upon the constitutional question raised by appellee.

Appellant by her application to further amend her complaint seeks to allege that American Express "a citizen, of the State of New York, is a joint stock association organized under the laws of New York".[2] American Express in opposing this says primarily that it is an unincorporated association with no citizenship of its own and cannot be sued in the federal courts on the basis of diversity. It also urges that as it had a member residing in Virginia when suit was commenced there is no diversity between it annd appellant who is "likewise alleged to reside in Virginia".

American Express is a joint stock association formed under the laws of the State of New York. Mack v. American Express Co., 20 Misc. 215, 45 N.Y.S. 362. As such it is considered for practical purposes a corporation by the courts of that state. Hibbs v. Brown, 122 App.Div. 214, 98 N.Y.S. 353 affirmed 190 N.Y. 167, 82 N.E. 1108; Jones v. Healy, 184 Misc. 923, 55 N.Y.S.2d 349, affirmed 270 App.Div. 895, 62 N.Y.S.2d 605, appeal denied 270 App. Div. 998, 64 N.Y.S.2d 170. Where American Express was sued in its own name in New York and entered a general appearance, despite the fact that under the New York General Associations Law the name of its president or treasurer should have been included,[3] the suit was sustained. The court in that decision said, "The failure to add the name of the president or

---

[1] Act of 1935, P.L. 503, Section 1, 12 P.S.Pa. § 51.

[2] Paragraph 2 of the original complaint which appellant seeks to amend, reads: "The defendant, American Express Company is an unincorporated association organized under the Articles of Merger of the State of New York, engaged in the business of selling Money Orders and Travellers checks in the city and county of Phil-adelphia, the State of Pennsylvania and other states of the United States and having its main office at 65 Broadway, New York, N. Y."

[3] Section 13 of the General Associations Law of New York, added by Laws 1920, c. 915, Section 6, effective, April 15, 1921, 18a McKinney's Consolidated Laws of New York, c. 29.

treasurer to the name of the association can be corrected by amendment. Such amendment would not be changing the parties to the action but would be the correction of the name of a party." Mack v. American Express Company, supra, 45 N.Y.S.2d at page 363. In the late case of Schivera v. Long Island Lighting Co., Sp.Ct.N.Y., 1946, 61 N.Y.S.2d 430,[4] one of the defendants was the Construction Trades Council of Nassau and Suffolk Counties, an unincorporated society with officers, sued simply by name. A general appearance having been entered for it, the court of its own motion amended the process by adding the name of its treasurer.

 In this litigation the venue was laid in the Eastern District of Pennsylvania. By Rule 17(b) of the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723C, the law of Pennsylvania determines the capacity of American Express to sue or be sued.[5] The Pennsylvania Rules of Civil Procedure provide that a joint stock company or association may be sued in its own name.[6] American Express was here sued in its own name. It appeared and defended without objection and obtained a direction of verdict in the trial court. It never raised the question of its suability as an entity until, after rehearing the present appeal, we reversed the judgment and sent the case back for retrial.

Neither the facts nor the law indicate that such contention should now prevail. The point involved, in our view, is not under the rule of Chapman v. Barney, 129 U.S. 677,[7] 9 S.Ct. 426, 32 L.Ed. 800, and similar cases as appellee insists but is simply as Professor Moore puts it in his book that "a partnership or other unincorporated association may always sue or be sued in its common name if" the law of the state in which the district court is held "recognizes such capacity."[8] Cf. Operative Plasterers, Etc. Ass'n v. Case, 68 App. D.C. 43, 93 F.2d 56. The motion to dismiss appellant's application to further amend her complaint is therefore denied and said amendment is allowed.

 We see no justification for appellee's request to be permitted at this time to set up the Pennsylvania one year statute of limitations in its amended answer. That statute is an affirmative defense and must be pleaded. Rule 8(c) Federal Rules of Civil Procedure.[9] Since it has not been pleaded it is waived under Rule 12(h).[10]

In all other respects our former opinion filed October 21, 1947 is confirmed.

---

[4] This case was reversed on other grounds, 270 App.Div. 852, 60 N.Y.S.2d 793; affd. 296 N.Y. 26, 69 N.E.2d 233.

[5] "(b) Capacity to Sue or Be Sued. The capacity of an individual, other than one acting in a representative capacity, to sue or be sued shall be determined by the law of his domicile. The capacity of a corporation to sue or be sued shall be determined by the law under which it was organized. *In all other cases capacity to sue or be sued shall be determined by the law of the state in which the district court is held;* except that a partnership or other unincorporated association, which has no such capacity by the law of such state, may sue or be sued in its common name for the purpose of enforcing for or against it a substantive right existing under the Constitution or laws of the United States." (Emphasis ours).

[6] Rules 2176, 2177, 12 P.S.Appendix.

[7] The rule of the old Chapman decision, supra, that generally speaking an unincorporated association has no citizenship for diversity purposes is itself beginning to show signs of being outmoded. In Puerto Rico v. Russell & Co., 288 U.S. 476, 53 S.Ct. 447, 77 L.Ed. 903, a Porto Rican sociedad en commandia which is "a limited partnership in the common law sense" was held to be an entity for jurisdictional purposes. See 2 Moore's Federal Practice page 2100.

[8] 2 Moore's Federal Practice, page 2097.

[9] Rule 8 (c) reads: "Affirmative Defenses. *In pleading to a preceding pleading, a party shall set forth affirmatively* accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, *statute of limitations*, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation." (Emphasis ours).

[10] Rule 12 (h) reads: "Waiver of De-

---

fenses. A party waives all defenses and objections which he does not present either by motion as hereinbefore provided or, if he has made no motion, in his answer or reply, except (1) that the defense of failure to state a claim upon which relief can be granted, and the objection of failure to state a legal defense to a claim may also be made by a later pleading, if one is permitted, or by motion for judgment on the pleadings or at the trial on the merits, and except (2) that, whenever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action. The objection or defense, if made at the trial, shall then be disposed of as provided in Rule 15 (b) in the light of any evidence that may have been received."