**HIEBERT CONTRACTING COMPANY,**
**Plaintiff,**

v.

**Nathan A. TRAGER and Edith Trager,**
**Defendants.**

**Civ. A. No. 63–821–C.**

United States District Court
D. Massachusetts.

Oct. 31, 1967.

Kirk S. Giffen, Boston, Mass., for plaintiff.

Samuel Cohen, Boston, Mass., for defendants.

CAFFREY, District Judge.

This is a civil action for breach of contract brought by Hiebert Contracting Company, a corporation organized under the laws of the State of Alaska, with a usual place of business in Somers, Montana, against Nathan A. Trager and Jack Trager, residents of the Commonwealth of Massachusetts. Edith Trager, Administratrix of the Estate of Jack Trager, was substituted as a party-defendant subsequent to the jury trial of the action. Juridiction of this court is based on diversity of citizenship.

The issue of liability was tried to a jury on the basis of three special interrogatories. Thereafter, following a continuance requested by the parties for the purpose of additional discovery limited to the issue of damages, the issue of damages was tried to the Court, pursuant to Rule 49(a), Federal Rules of Civil Procedure. See Clegg v. Hardware Mutual Cas. Co., 264 F.2d 152 (5th Cir. 1959).

The jury, in response to the three special interrogatories, found (1) that plaintiff and defendants entered into a contract in the spring of 1963, (2) that this contract called for the delivery by plaintiff to defendants of 35,000 barrels (actually empty oil drums) at a price of $1.90 per barrel, and (3) that the contract was breached by the defendants.

The evidence adduced at the trial establishes that the United States Air Force found itself in possession of thousands of empty 55-gallon drums which had been used to transport jet airplane fuel to the King Salmon Air Force Base in Alaska, that the Air Force invited bids for the purchase of these drums, under Bid Invitation No. 65–501–s–63–13, and that thereafter various parties filed sealed bids for the right to purchase and to remove a lot consisting of 35,000 empty oil drums. Plaintiff was an unsuccessful bidder for these barrels, it being determined after the opening of the bids that plaintiff had submitted the second highest bid. The high bidder was Contractors Machinery Sales & Rental, Inc., of Anchorage, Alaska, which in October 1962 bid $18,200 for the lot. The terms and conditions of the Air Force offer to sell required the successful bidder to make a cash payment to the Air Force in the amount of 20 per cent of the bid, and also to make arrangements to pay the balance of the contract price and to remove the barrels from the King Salmon Air Force Base within one year, in default of which the 20 per cent payment would be (and in fact was) retained by the United States as liquidated damages for non-performance.

On February 4, 1963, Contractors Machinery Sales & Rental, Inc. assigned to plaintiff all its right, title and interest in the barrels, subject to the lien of the United States Government, for payment of $7560.00, the balance due under the terms of the successful bid. Negotiations between plaintiff and the defendants began in the latter part of April 1963 and culminated in their making the contract which, as indicated above, the jury found required the defendants to purchase 35,000 barrels for the sum of $66,500.

At the close of the plaintiff's evidence, the defendants moved for a directed verdict. Decision thereon was reserved by the Court pursuant to the provisions of Rule 50, Federal Rules of Civil Procedure. Defendants then presented certain evidence, at the close of which they both failed to renew their motion for a directed verdict and the case was submitted to the jury on special interrogatories as above outlined. The motion for directed verdict is denied because by failing to renew same at the close of all the evidence the defendants must be taken to have waived same. In O'Malley v. Cover, 221 F.2d 156 (8th Cir. 1955), the Court stated, at p. 158:

"At the close of the plaintiff's case the defendant moved for a directed verdict * * *. The court reserved its ruling on the motion. The defendant then proceeded to introduce

his evidence, thereby waiving his motion for the direction of a verdict."

■ The defendants have also filed and briefed a motion for a new trial. This motion is denied without prejudice because having been filed both prior to the entry of judgment and prior to the filing of any findings whatsoever on the issue of damages it is premature. It is also denied for the reason that defendants have no standing to move for a new trial because they are not aggrieved by the judgment filed with this memorandum. Cf. 6A Moore, Federal Practice, sec. 59.09, at p. 3842 (2d ed. 1953).

With regard to the issue of damages, which was tried to the Court, suffice it to say that the Court accepts as factual the testimony and opinions of the defendants' expert, John A. Kutz, who has had substantial experience at the Todd Shipyard, Seattle, Washington, as a naval architect, and who has been affiliated with a firm of naval architects and marine engineers for several years thereafter. Mr. Kutz testified that the catamaran barge by which plaintiff intended to perform this contract could not, in fact, do what plaintiff said it would do in performance of the contract and could not perform the necessary sea travel at all. He likened plaintiff's catamaran to two giant canoes held together by curtain rods, and further expressed the opinion that the hull area was inadequate to support the intended high load against the strain of high winds, high seas, and a tow line. Mr. Kutz further testified that while a conventional vessel can be designed so as to recover its stability from a 90-degree list he was of the opinion that the maximum list from which an unloaded catamaran could recover would be 45 degrees, and that the probability was that when loaded it would be unable to recover from an even lesser list due to the well known free surface effect of water. He expressed the opinion that under certain conditions this barge would be unable to recover from a list of as little as 15 degrees and that if one pontoon came

out of the water due to list while loaded its recovery chances were zero.

Mr. Kutz testified that his examination of the barge indicated that old bed frames had been used as part of the rig supporting the decks, that the transverse girders were lightly tack-welded, that the girders used had previously been used as forms for concrete pilings, and that they had large octagonal cut-outs which lessened their strength substantially. He further testified that the deck of the catamaran barge was constructed of 36', 2 x 12 planks. His examination of the deck revealed that the 2 x 12 planks were of low grade, wide-grained material, full of knots. Mr. Kutz expressed the opinion that wood of this inferior quality would not support a 150-ton load of barrels because of the absence of proper underpinning supports, with the result that he believed there was serious danger that the barge under such a load would break up in a high sea, thus losing her entire cargo. Mr. Kutz also testified that he was of the opinion that with a 150-ton load the barge would submerge to a draft of 7'2", leaving only 17" or 18" of freeboard, with resultant serious aggravation of marine risks.

Another serious deficiency in the plaintiff's barge, according to Mr. Kutz, was the fact that her towing bits were made of very light-guage material which he likened to bucket handles. He expressed the opinion that these towing bits would give way under the strain of a tow line when the barge was fully loaded, leaving her at the mercy of the elements. Mr. Kutz testified as to a number of additional deficiencies in the barge which he took into account in forming his opinion. Plaintiff failed to rebut Mr. Kutz' testimony with any evidence which I find credible. Upon evaluating all the evidence relating to the construction, equipment, and operating characteristics of this barge, particularly the testimony of Mr. Kutz and the plans and photographs submitted in evidence, I find that the partially built catamaran barge could not have performed this contract even had it been

completed. I further find that the plaintiff corporation had no alternative equipment available, nor, for that matter, any intention of performing this contract with alternative equipment of a seaworthy nature.

Over and above the inadequacies of the barge to perform this contract, plaintiff has failed to prove its ability to perform the removal of the barrels on a profitable basis. Plaintiff had no contractual arrangements to insure the availability of a labor force capable of moving 35,000 barrels out of the King Salmon Air Force Base to a vessel. Plaintiff testified that he expected to use off-duty Air Force enlisted men, and that in his opinion a sufficient number of off-duty airmen willing to work at $2.90 per hour would perform the manual labor necessary to get the barrels from the Base on to boats or barges. His expectation that off-duty airmen would be available seems to be solely predicated on the deposition testimony of Charles Scrivener, President of the Atlantic Trainship Corporation, who testified "Well, I have never used military personnel myself but in the cannery where I stayed in 1959 and 1960 they used them there, and in the Red Salmon cannery, which is just slightly east of the village of Naknek, to my personal knowledge they used them there in the years '61 and '62." Having in mind that plaintiff had no contract with any Air Force personnel and that the record is devoid of any evidence as to the number of enlisted men on duty at the King Salmon Air Force Base, is devoid of any evidence as to the nature and extent of the off-duty hours of the enlisted men, and devoid of any evidence tending to indicate that the military authorities would allow military personnel to accept this kind of off-duty employment at the time when plaintiff hoped to utilize them, I am not persuaded that this was more likely so than not, and I find that the availability of adequate labor has not been shown. Nor am I persuaded that lacking an adequate labor force plaintiff could remove the barrels by use of mechanical equipment. The evidence indicates that the only mechanical equipment plaintiff planned to bring to the Air Force Base (if the barge succeeded in making the trip) was the following: a 1½-ton 1948 Dodge truck, a 2-ton 1948 Mack truck, a 1944 Ford truck (size unspecified), and a fork lift tractor. There is nothing in the record to indicate that included in the plaintiff's plan were arrangements for the presence of skilled personnel to service and repair any of this mechanical equipment in the event of a breakdown. There was no indication as to what, if any, replacement parts were to be taken along. Absent skilled supporting personnel and an adequate supply of spare parts, and having in mind the extremely rough condition of the terrain and the substantial risk of bad weather in this area, I am not persuaded that the plaintiff has shown its ability to evacuate 35,000 barrels from the King Salmon Air Force Base by utilizing for that purpose one 19-year old truck and two 15-year old trucks, none of which is shown to be of particularly substantial size (all were smaller than the 2½-ton truck which was the workhorse of the United States Army during World War II).

Since the plaintiff was unable to perform the contract it may not recover for the defendants' breach, because the plaintiff suffered no loss through the defendants' default. See Brunswick-Balke-Collender Co. v. Foster Boat Company, 141 F.2d 882 (6th Cir. 1944).

I rule that the plaintiff has failed to prove it had the physical ability to perform the contract, that plaintiff has failed to prove it had the financial ability to perform the contract, and that plaintiff has failed to sustain its burden of proving money damages in any reasonably ascertainable amount.

Judgment for the defendants.